**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 18-CV-25099-MORENO/STRAUSS**

ACHERON PORTFOLIO TRUST,
AVERNUS PORTFOLIO TRUST,
LORENZO TONTI 2006 TRUST,
STYX PORTFOLIO TRUST, and
ACHERON CAPITAL, LTD.,

      Plaintiffs,

v.

BARRY MUKAMAL, as Trustee of the
MUTUAL BENEFITS KEEP POLICY TRUST,

      Defendant.

_____/

## REPORT AND RECOMMENDATION

    **THIS MATTER** comes before the Court upon Plaintiffs' Motion for Partial Summary

Judgment and Incorporated Memorandum of Law ("Plaintiffs' MSJ") (DE 75), and Trustee's

Motion for Final Summary Judgment on All Counts of Plaintiffs' Third Amended Complaint and

Memorandum of Law ("Defendant's MSJ") (DE 77).  The District Court has referred this case to

me pursuant to 28 U.S.C. § 636 and the Magistrate Judge Rules of the United States District Court

for the Southern District of Florida to take all necessary and proper action as required by law, with

respect to any and all pretrial matters ("Referral").[1]  (DE 117).  I have reviewed the motions and

all pertinent portions of the record.[2]  For the reasons stated herein, I respectfully **RECOMMEND**

---

[1] Subsequent to the Referral, the District Court issued an Order of Continuance and Order Revising Pretrial Deadlines and set trial for the two-week period commencing December 6, 2021.  (DE 125).

[2] Among other filings, I have reviewed the briefing on Plaintiffs' MSJ (DE 89, 96), the statements of facts related to Plaintiffs' MSJ (DE 74, 90, 93), the briefing on Defendant's MSJ (DE 91, 97, 99), the statements of facts related to Defendant's MSJ (DE 76, 92), the Defendant's notice of supplemental authority in support of Defendant's MSJ (DE 118), the Defendant's motion for

that Plaintiffs' MSJ (DE 75) be **DENIED** and that Defendant's MSJ (DE 77) be **GRANTED IN PART AND DENIED IN PART** as discussed below.

## BACKGROUND

As stated previously by this Court: "[t]his case ensued when this Court denied Plaintiffs' Rule 60(b) motion in *Sec. and Exch. Comm'n v. Mutual Benefits Corp.*, Case No. 04-60573-CIV-MORENO [("Receivership Action")][3] . . .  and found [in that action] that Plaintiffs were not entitled to $2 million in restitution funds, which the Receiver in that case earmarked for the Trustee to use as a fee credit for the original Mutual Benefits fraud victims. Plaintiffs are purchasers of interests in viaticated life insurance policies, which the Defendant Barry Mukamal [(the "Trustee")] oversees as the Trustee of the Mutual Benefits Keep Policy Trust [(the "Trust")]. Plaintiffs are now suing the Trustee for breach of contract and breach of fiduciary obligations." (DE 45 at 1) (granting in part and denying in part Defendant's motion to dismiss Plaintiffs' Second

---

judicial notice (DE 120, DE 131; DE 137), the briefing on Defendant's motion to exclude Plaintiffs' expert (DE 122, DE 132; DE 139), all exhibits to the foregoing docket entries, and all other filings from this case that are referred to in the foregoing docket entries.

[3] References to documents in the Receivership Action are denoted as: (SEC DE ##).  I find that it is proper and helpful to the Court to take judicial notice of the docket and the court files in the Receivership Action and in *Acheron Portfolio Tr. v. Mukamal, as Tr. of Mut. Benefits Keep Pol'y Tr.*, Case No. 20-25025-CIV-GAYLES ("Arbitration Action") (collectively, the "Related Litigation") pursuant to Federal Rule of Evidence 201.  The Court notes that Plaintiffs' MSJ and related briefings include requests for judicial notice: (DE 74 at n.1) (requesting the Court to take judicial notice of the docket and the court files in Receivership Action, which Plaintiffs assert "is at the center of this case and is referenced throughout [their] motion"); (DE 75 at n.2) (same); (DE 92 at n.2) (same); (DE 92 at ¶65) (requesting the Court to take judicial notice of a related court filing in the Arbitration Action in support of Plaintiffs' assertion).  The Court also notes that Defendant has filed a separate motion seeking judicial notice.  (DE 120) (moving the Court to take judicial notice of certain dispositive rulings in the Related Litigation and in *Mukamal v. Acheron Capital, Ltd.*, JAMS Case No.: 1460006922 ("Arbitration") pursuant to Federal Rule of Evidence 201 *in considering pre-trial matters*, including Defendant's summary judgment motion)).  Plaintiffs oppose Defendant's Motion to Take Judicial Notice (DE 120).  (DE 131).  I separately address the dispute with respect to Defendant's Motion to Take Judicial Notice and here take judicial notice of the Related Litigation just as to matters not reasonably in dispute.

Amended Complaint; *see also Acheron Portfolio Tr. v. Mukamal as Tr. of Mut. Benefits Keep Pol'y Tr.*, No. 18-25099-CIV, 2020 WL 9671339, at *1 (S.D. Fla. July 14, 2020).  Plaintiffs' operative complaint ("Third Amended Complaint"), filed on August 13, 2020, brings four counts: (1) Breach of Contract (March 2015 Agreement); (2) Breach of Fiduciary Duty; (3) Breach of Implied Fiduciary Duty; and (4) Breach of Contract (Trust Agreement).  (DE 46).  Before turning to the undisputed facts on which the parties' motions turn, however, I address the deficiencies in the parties' statements of material facts and responses to those statements of material facts.

## I.    The Statements of Material Facts and the Applicable Rules

In relevant part, Federal Rule of Civil Procedure 56(c) requires "[a] party asserting that a fact cannot be or is genuinely disputed [to] support the assertion by [citing to appropriate record evidence]; or . . . [show] that the materials cited do not establish the absence or presence of a genuine dispute."  Fed. R. Civ. P. 56(c)(1)(A)-(B).  "If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court[, among other things,] may: . . . consider the fact undisputed for purposes of the motion."  Fed. R. Civ. P. 56(e).  Additionally, Local Rule 56.1 requires statements of material facts to present the facts in separately numbered paragraphs, to limit each paragraph to a single material fact to the extent practicable and to reference sufficient evidentiary support for each assertion of fact.  S.D. Fla. L.R. 56.1(b)(1)(B).  Opponents challenging statements of material fact are to include citations to record evidence that are specific to the particular fact disputed. S.D. Fla. L.R. 56.1(b)(2)(C).  "Any additional facts that an opponent contends are material to the motion for summary judgment shall be numbered and placed immediately after the opponent's response to the movant's Statement of Material Facts."  S.D. Fla. L.R. 56.1(b)(2)(D).  "If an opponent's Statement of Material Facts includes additional facts, then the movant shall respond to each additional fact in a separately served Reply Statement

of Material Facts." S.D. Fla. L. R. 56.1(b)(3)(A). Furthermore, material facts, which the Court finds have proper evidentiary support, may be deemed admitted unless controverted by the other party in accordance with the rules. S.D. Fla. L.R. 56.1(c)-(d); *see also Cargo Airport Servs. USA, LLC v. Transcarga Int'l Airways, C.A., Inc.*, No. 17-20768-CIV, 2017 WL 4898292, at *3 (S.D. Fla. Oct. 27, 2017) (Moreno, J.).

Here, there are several deficiencies with the parties' statements of material facts and responses. First, the parties include multiple facts in one paragraph. *See*, e.g., DE 74 at ¶¶6, 15, 18, 21, 22, 23; DE 76 at ¶¶1, 22, 29, 59 (consisting of multi-fact paragraphs that are disputed by the opposing party). Second, in opposing facts, Defendant does not consistently address all of the facts, which Plaintiffs assert. For example, Plaintiffs assert in ¶6 of their statement of material facts, among other things, that "approximately 2,400 Keep Policies were transferred to the Trust" and that "more than 16,000 investors (including Acheron) . . . held fractional investment interests in the Keep Policies [that were] transferred to the Trust." (DE 74 at ¶6). Plaintiffs cite to the operative complaint, which states that "approximately 2,400 Keep Policies were transferred to the Trust" and that "more than 16,000 investors (including Acheron) . . . held fractional investment interests in the Keep Policies [that were] transferred to the Trust." (DE 46 at ¶22). Plaintiffs also cite to Defendant's answer, where Defendant admitted these facts. (DE 47 at ¶22). Defendant, however, responds to Plaintiffs' assertion in ¶6 by stating: "DISPUTED" and then by arguing that Plaintiffs' citations to the operative complaint and answer "make no reference to the Keep Policies or 'related assets' having 'been owned by the Receivership Entities.'" (DE 90 at ¶6). Yet, Defendant fails to address the other facts, which he had previously admitted. Indeed, Defendant neither admits these facts nor cites evidentiary support for disputing these facts.

Third, Plaintiffs fail to offer controverting evidence when disputing some of the facts asserted by Defendant.  For example, Plaintiffs merely say "disputed" without explanation or evidentiary support with respect to Defendant's assertion that "'Keep Policy Investors' were understood to mean the Victim Investors who were victims of the MBC scheme and who purchased interests from the Receivership Entities" (DE 76 at ¶12).  (DE 92 at ¶12).[4]  Accordingly, the Court deems facts admitted where Defendant provides sufficient evidentiary support for his assertion, and Plaintiffs fail to provide controverting evidence to support disputing the assertion.  Fed. R. Civ. P. 56(e); S.D. Fla. L.R. 56.1(c)-(d); *Cargo Airport Servs. USA, LLC*, 2017 WL 4898292 at *3.

Fourth, there are unnecessary disputes relating to distinctions between Plaintiffs Acheron Portfolio Trust, Avernus Portfolio Trust, Lorenzo Tonti 2006 Trust and Styx Portfolio Trust (the "Plaintiff Trusts" or the "Acheron Trusts") and Plaintiff Acheron Capital, Ltd. ("Acheron Capital").  Despite Plaintiffs knowing that Defendant challenged that the Plaintiff Trusts were signatories to the March 2015 Agreement in the Arbitration Action,[5] Plaintiffs did not clearly differentiate between the Plaintiff Trusts and Plaintiff Acheron Capital in their statement of material facts.  (DE 74 at 1) (defining Acheron Capital and the Plaintiff Trusts "collectively and individually" as "Plaintiffs" or "Acheron").[6]  Therefore, Defendant disputes several of Plaintiffs'

---

[4] Another example is Defendant's assertion in ¶22 of his statements of facts that "only the Trustee and Acheron Capital are parties to [the March 2015 Agreement].  (DE 76 at ¶22).  Plaintiffs fail to address this specific assertion in their response and certainly do not provide any evidence refuting the assertion.  (DE 92 at ¶22).

[5] *See* Arbitration Action, *Acheron Portfolio Tr. v. Mukamal, as Tr. of Mut. Benefits Keep Pol'y Tr.*, Case No. 20-25025-CIV-GAYLES.  Defendant's motion to dismiss filed on January 4, 2021 (Arbitration Action DE 13 at 11) challenged the Plaintiff Trusts' ability to compel arbitration by alleging that they are not signatories to the March 2015 Agreement.

[6] In the Related Litigation, "Acheron" often referred to the Acheron entities generally or to Plaintiff Acheron Capital and the Plaintiff Trusts collectively.

facts, in part, by stating that "Plaintiffs . . . lumped each of the five Plaintiffs together." (DE 90 at ¶¶13, 15, 16, 17, 18). On the other hand, Defendant does not affirmatively admit, even where possible, that any of these facts are undisputed as to the Plaintiff Trusts. For example, Plaintiffs assert in ¶13 of their statement of material facts that "the Trustee has made bulk sales to Acheron *every few months* to buy interests in Keep Policies . . .." (DE 74 at ¶13) (emphasis added). Plaintiffs support their assertion in ¶13, in part, by citing to ¶27 of the operative complaint and Defendant's answer. (DE 74 at ¶13). In answering the operative complaint, Defendant expressly stated "that offers to buy interests in Keep Policies were made to Acheron *every few months*." (DE 47 at ¶27) (emphasis added). Yet, Defendant responds to Plaintiffs' statement of material facts by essentially stating: "DISPUTED because Plaintiffs have lumped each of the five Plaintiffs together . . ." followed by "Trustee does not dispute that the Trust has sold interests in certain policies to certain of the Acheron Trusts *from time to time pursuant to the APAs between them*." (DE 90 at ¶13) (emphasis added). Although Plaintiffs could have set out more distinctly their assertions as to the individual Plaintiffs in this case, by not affirmatively admitting undisputed facts where clearly possible, Defendant has also improperly increased the Court's burden in determining the undisputed facts. *See Chavez v. Sec'y Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) (noting that "making district courts dig through volumes of documents . . . shift[s] the burden from [parties] to the courts").

Fifth, Defendant has failed to reply to the additional facts that Plaintiffs included in their response to Defendant's statement of material facts. (DE 92 at 9). Local Rule 56.1(b)(3)(A) directs a movant to respond to an opponent's additional facts. Because Defendant provided no response to Plaintiffs' additional facts, the Court deems admitted those additional facts for which Plaintiffs provided sufficient evidentiary support.

Sixth, both parties improperly insert additional facts into their opposition to assertions of undisputed material facts made by the other side.  As an example, Defendant asserts as an undisputed fact that "[a]t no . . . time has the Trustee ever sold a policy in which the Acheron Trust already own an interest without first extending to the Acheron Trusts the opportunity to buy other interests in the policy pursuant to the disposition services routinely conducted by Litai."  (DE 76 at ¶50).  Plaintiffs expressly dispute this assertion and then allege (without a citation to the record) that "[t]he Trust has unilaterally and without notice altered or directed Litai to alter its procedures for offering interests in Keep Policies to Acheron for purchase."  (DE 92 at ¶50).  Plaintiffs' additional allegation regarding altered sales procedures does not refute, or even relate to, Defendant's assertion that he did not sell policy interests in policies partially owned by the Plaintiff Trusts without first offering the interests to the Plaintiff Trusts.  For Plaintiffs to assert such allegation as an additional fact, Local Rule 56.1(b)(2)(D) requires them to separately list it as they did for certain other additional facts in their response to Defendant's statement of material facts. *See* DE 92 at 9; S.D. Fla. L.R. 56.1(b)(2)(D).  Therefore, the Court does not consider Plaintiffs' improperly made assertions in determining the undisputed facts.

As noted, however, Plaintiffs are not alone in improperly inserting additional facts. Defendant also improperly adds facts to his opposition statements.  For example, Plaintiffs' assert that, "[a]ccording to the Trustee, he 'voluntarily' paid the Administrative Fee Credit to Acheron even though he now claims Acheron was not entitled to such a credit because he maintains Acheron is not a Keep Policy Investor."  (DE 74 at ¶18).  Defendant adds to his dispute of this fact that "the *Trust* voluntarily granted the Administrative Fee Credit during the term of the *initial* Servicing Agreement based on, among other things, projections relating to the duration of the Trust and the amount of funds available to the Trust for such a fee credit."  (DE 90 at ¶18) (emphasis in original).

If Defendant intended to rely upon his asserted basis for making the voluntary payment of the Administrative Fee Credit, then Defendant should have "numbered and placed immediately after [Defendant's] response to [Plaintiffs'] Statement of Material Facts" this new fact.  S.D. Fla. L.R. 56.1(b)(2)(D).  Because Defendant failed to properly assert the Trustee's basis for making the voluntary payment of the Administrative Fee Credit, the Court does not consider it in determining the undisputed facts.

## II.    The Undisputed Facts

Applying the principles explained above to the parties' statements of facts, I find that the following facts are undisputed.  The Receivership Action established a receivership to handle a massive fraud where over 30,000 investors ("Victim Investors") were induced through misrepresentation into investing in viaticated insurance policies owned by Mutual Benefits Corp. ("MBC").  (DE 74 at ¶3 (citing DE 24 at 2); DE 90 at ¶3).[7]  In that case, on May 3, 2004, the Securities and Exchange Commission filed an enforcement action against MBC and related entities (collectively, the "Receivership Entities").  (DE 74 at ¶4; DE 90 at ¶4).  On May 4, 2004, the Court appointed Roberto Martinez as receiver ("Receiver") and authorized the Receiver to take possession of all property of the Receivership Entities, including certain viaticated insurance policies owned of record by the Receivership Entities (the "Receivership Order").  (DE 76 at ¶1; DE 92 at ¶1; SEC DE 26 at ¶1; DE 46 at ¶15; DE 47 at ¶15).  On September 14, 2005, the Court entered its Order on Disposition of Policies and Proceeds (SEC DE 1339) (the "Disposition Order").  On November 22, 2005, the Court entered its Order Clarifying Disposition Order and Approving Form of Notice (SEC DE 1474; DE 76-10) (the "Clarification Order").  Through the

---

[7] A paperless response (DE 93) was entered to Plaintiffs' statement of material facts (DE 74), which refers back to the document filed at DE 90.  For ease of reference, I cite going forward only to DE 90.

Disposition Order and the Clarification Order, the Court provided the Victim Investors a choice to either keep their interests in policies and pay their share of premiums and administrative fees or sell their policies and receive a pro rata share of the proceeds.  (DE 76 at ¶¶2-3; DE 92 at ¶¶2-3).

In 2006, the Receiver mailed a notice to Victim Investors inviting their vote as to disposition of their interest and including preference forms.  The notice and preference forms informed Victim Investors that:

> In order to administer the policies on behalf of the investors, the nominal ownership of the policies will continue to be controlled by the Receiver, although prior to the termination of the Receivership, the Receiver will seek court approval to appoint a trustee, subject to a court-approved trust agreement, to serve as nominal owner on behalf of all investors until the policies mature.

(DE 76 at ¶¶4-5 (citing SEC DE 1370 at 9; DE 76-9 at 9; DE 76-11; DE 76-12); DE 92 at ¶¶4-5). As a result of the voting, 3,037 policies were designated to be retained ("Keep Policies") by investors in such Keep Policies ("Keep Policy Investors").  (DE 76 at ¶6; DE 92 at ¶6).  The "Keep Policy Investors" were understood to mean the Victim Investors who were the victims of the MBC scheme and who purchased interests from the Receivership Entities.  (DE 76 at ¶12; DE 92 at ¶12). On January 26, 2007, the Court granted a motion by the Receiver to designate the Receiver as the Policy Owner or Absolute Assignee and Nominal Beneficiary with respect to all policies administered by the receivership, including all policies previously owned by MBC and its affiliates.  (DE 76 at ¶7; DE 92 at ¶7).

In April 2009, the Receiver requested, and the Court thereafter approved, the creation of the Mutual Benefits Keep Policy Trust (the "Trust"), and the Receiver appointed Barry Mukamal as Trustee of the Trust (the "Trustee") on September 25, 2009.  (DE 76 at ¶8; DE 92 at ¶8).  The Receiver created the Trust to preserve the Keep Policies for the benefit of the Victim Investors who elected to become Keep Policy Investors.  (DE 76 at ¶9; DE 92 at ¶9).  The agreements

comprising the Court-approved transaction whereby the Trust was created included: (1) the Asset Purchase Agreement ("Litai APA"); (2) the Transitional Services Agreement; (3) the Servicing Agreement ("Servicing Agreement") (DE 76-19); and (4) the Mutual Benefits "Keep Policy" Trust Agreement (the "Trust Agreement") (DE 76-20) (collectively, the "Agreements").  (DE 76 at ¶8; DE 92 at ¶9; DE 76-13; SEC DE 2266-1 to SEC 2266-5).

Pursuant to the Litai APA, the Receiver closed on the sale of certain assets owned by the Receivership Entities to what is now known as Litai Assets, LLC ("Litai").  (DE 74 at ¶10; DE 90 at ¶10).  Contemporaneous with the closing of the Litai APA and the formation of the Trust, the Trustee entered into the Servicing Agreement with Litai, pursuant to which Litai agreed, *inter alia*, to manage the portfolio of Keep Policies in the Trust, which included collecting the funds needed to service the policies and to pay the policies' premiums.  (DE 74 at ¶11; DE 90 at ¶11).

The Litai APA defines "Keep Policy Investors" as "persons who have invested in an entire interest or a fractional interest in a Keep Policy *owned of record by the Receivership Entities*. (DE 76-13 at 24; SEC DE 22-1, Art. 1, § 1.1) (emphasis added).  The Trust Agreement also defines the term "Keep Policy Investors," in a manner consistent with the Litai APA, as follows:

> Persons who have invested in an entire interest or a fractional interest in a Keep Policy *owned of record by the Receivership Entities*, and whose interest in such Keep Policy has not been forfeited as of the Closing Date."

(DE 76 at ¶10 (citing Ex. 20, § 1.1); DE 92 at ¶10; DE 76-20 at 1-3) (emphasis added).  The Trust Agreement defines the term "Receivership Entities" as MBC, Viatical Services, Inc., and Viatical Benefactors, LLC.  (DE 76-20; SEC DE 2540-1 at Art. 1, § 1.1).

At the time the Trust was formed, the Court issued Orders authorizing the Receiver to transfer ownership of the Keep Policies to the Trust.  (DE 46 at ¶ 20; DE 47 at ¶20).  Specifically, the Court ordered "the transfer[] [of] the ownership and nominal beneficial interest in the Keep

10

Policies to [the] Trustee to serve in the stead of the Receiver." (DE 76 at ¶14; DE 92 at ¶14). The Trustee understood that the purpose of the Trust was to maintain and preserve the Keep Policies for the benefit of Victim Investors and that he is fiduciary to the Victim Investors who continue to hold interests in Keep Policies. (DE 76 at ¶13; DE 92 at ¶13).

The stated purpose of the Trust as set forth in Article 2, Section 2.2 of the Trust Agreement is as follows: "The purpose of the Trust is to take custody of the Trust Assets and maintain and administer the Trust Assets for the benefit of the Keep Policy Investors, consistent with the terms and procedures set forth in this Trust Agreement." (DE 92 at ¶63; DE 46-1 at Art. 2, § 2.2; DE 76-20 at Art. 2, § 2.2). The Trustee serves as fiduciary for the Trust, and his conduct is governed by the Trust Agreement. (DE 74 at ¶7; DE 90 at ¶7). The Trust Agreement, in turn, is governed by Florida law. (DE 76-20 at § 7.1; DE 46 at ¶24; DE 47 at ¶24).

Beginning in late 2008, the Plaintiff Trusts purchased defaulted viaticated interests in life insurance policies from the Receiver in the Receivership Action and later purchased such interests from the Trust after creation of the Trust in September 2009. (DE 76 at ¶¶15-17; DE 92 at ¶¶15-17); *Sec. & Exch. Comm'n v. Mut. Benefits Corp.*, 810 F. App'x 770, 772 (11th Cir. 2020) ("Acheron initially bought fractional interests in the Keep Policies from the receiver. It continued to do so after the policies were transferred to the Trustee."). Specifically, in 2008 and 2009, Acheron Portfolio Corporation (Luxembourg) S.A., Plaintiff Lorenzo Tonti 2006 Trust and Plaintiff Acheron Portfolio Trust purchased from the Receiver "Acquired Assets" as defined in Asset Purchase Agreements ("Receiver Asset Purchase Agreements") between the Receiver and the respective Acheron entities. (DE 74-1 at 3:¶6, 9-40; DE 74 at ¶5; DE 90 at ¶5). "Acquired Assets" are defined in the Receiver Asset Purchase Agreements as "all right, title and interest in and to the Fractional Interest(s) described and listed in the schedule attached hereto as of the

11

Closing Date." (DE 46-2 at Art. 2, § 2.1; DE 74-1 at 13:Art. 2, § 2.1). "Fractional Interest(s)" are defined as "fractional interest(s) in Undersubscribed Keep Policies Pursuant to Applicable Orders Entered in *Securities and Exchange Commission v. Mutual Benefits Corp., et al*, United States District Court, Southern District of Florida (CIV-MORENO 04-60573)." (DE 46-2 at Art. 1; DE 74-1 at 10-11:Art. 1). "Undersubscribed Keep Policy" is defined as "a Keep Policy which is in force but not fully funded because one or more investors in the policy has ceased making his or her share of the premium payments due on the policy." (DE 46-2 at Art. 1; DE 74-1 at 13:Art. 1). Thus, the "Acquired Assets," which the Plaintiff Trusts purchased from the Receiver, are defaulted viaticated interests in life insurance policies.

All of the Plaintiff Trusts' purchases of defaulted viaticated interests in life insurance policies have been either from the Receiver, or from the Trustee. (DE 76 at ¶21; DE 92 at ¶21). As of the time of Plaintiffs' MSJ, the Plaintiff Trusts held 67% of the face policy value of all the Keep Policies held in the Trust. (DE 74 at ¶17; DE 90 at ¶17). The Plaintiff Trusts are not original victims of the MBC fraud. (DE 76 at ¶21; DE 92 at ¶21). The Trustee attested in the Arbitration Action that: (i) "At all times material, sales by the Trust of defaulting fractional policy interests have been to [the Plaintiff Trusts]. Similarly, death benefits in the amount of over $245.1 million have been paid to those entities"; and (ii) "Acheron Capital, Ltd. has never purchased a policy interest from the Trust nor been paid on a maturity from the Trust." (DE 92 at ¶65) (citing to Arbitration Action DE 13-1 at ¶2).

The sale to the Plaintiff Trusts of interests in policies owned by the Trust in which Keep Policy Investors had failed to pay their pro rata share of premiums and administrative fees avoided

the lapse of such Keep Policies.[8]  (DE 74 at ¶13; DE 90 at ¶13).  Should a Keep Policy lapse, the remaining investors in such policy, who had paid the amounts due on their interests (had not defaulted), would nonetheless lose their interests.  (DE 74 at ¶13; DE 90 at ¶13).

The Plaintiff Trusts' purchases of defaulted interests from the Trust were made pursuant to asset purchase agreements together with a Bill of Sale and Instrument of Assignment and Assumption (collectively, the "APA's").  (DE 74 at ¶15; DE 90 at ¶15; DE 76 at ¶18; DE 92 at ¶18).  Every few months, the Trustee made bulk sales to the Plaintiff Trusts to buy interests in Keep Policies.  (DE 74 at ¶13; DE 90 at ¶13).  The Plaintiff Trusts and the Trustee have completed more than 50 policy sale transactions pursuant to separate APAs.  (DE 76 at ¶19; DE 92 at ¶19).  Since the Trust's inception and through the submission date of the Trustee's statement of material facts on March 4, 2021, Plaintiff Acheron Capital has never been a signatory to any APA and has never owned a single Forfeited Interest from the Trust.  (DE 76 at ¶20; DE 92 at ¶¶20, 65).  The Trustee has declared in the Related Litigation that Plaintiff Acheron Capital was represented to him as "an independent investment manager that assisted in managing the investments and portfolios of life settlement policies owned by [the Plaintiff Trusts]."  (DE 92 at ¶65; Arbitration Action DE 13-1, ¶3).  The Trustee also declared that he understood Plaintiff Acheron Capital "was the investment advisor that would recommend the purchase of future defaulting policy interests." (DE 92 at ¶65; Arbitration Action DE 13-1, ¶7).

---

[8]  Plaintiffs have reported paying "more than $9 million to purchase fractional interests in the subject life insurance policies during late 2008 and early 2009" and paying "the Trustee more than $35 million to acquire fractional interests in Keep Policies."  *Acheron Portfolio Tr. v. Mukamal as Tr. of Mut. Benefits Keep Pol'y Tr.*, No. 20-CV-25025, 2021 WL 2079734, at *1 (S.D. Fla. Apr. 6, 2021), *report and recommendation adopted*, No. 1:20-CV-25025, 2021 WL 2072428 (S.D. Fla. May 24, 2021).  As previously noted, "[a]ccording to the Mutual Benefits Trustee, the Trust Plaintiffs have received more than $245 million in death benefits as a result of their purchases from both the Receiver and the Trustee."  *Id.*

Under the five-year term of the Servicing Agreement, which started in 2009, the Plaintiff Trusts received an Administrative Fee Credit or subsidy paid by the Trust against the administrative fee owed by them to Litai.  (DE 74 at ¶18; DE 90 at ¶18; DE 76 at ¶23; DE 92 at ¶23).  In or around November 2014, the Trustee and Litai entered into a five-year renewal of the Servicing Agreement (the "Renewal Agreement"), subject to the Receivership Court's approval.  (DE 46 at ¶37; DE 47 at ¶37).  The Renewal Agreement stated that an Administrative Fee Credit would only be provided "with respect to those Keep Policy Investment Interests held by a person or entity who had acquired such interest prior to the entry of the Receivership Order."  (DE 76 at ¶24 (quoting DE 76-25 at § 2.3); DE 92 at ¶24).  Thus, the Renewal Agreement contained a provision eliminating the Administrative Fee Credit for the Plaintiff Trusts.  (DE 74 at ¶22; DE 90 at ¶22).  Plaintiffs understood the fee obligations imposed upon them by the Renewal Agreement.  (DE 76 at ¶36; DE 92 at ¶36).

As of January 28, 2015, the issue of the Plaintiff Trusts' entitlement to an Administrative Fee Credit remained unresolved.  (DE 76 at ¶25; DE 92 at ¶25).  On January 30, 2015, Plaintiff Acheron Capital's counsel commented on a draft of the March 2015 Agreement that is the subject of Count I of the Third Amended Complaint (the "March 2015 Agreement"), stating: "It does appear that we are making good progress on all but the administrative fee credit issue."  (DE 76 at ¶26; DE 92 at ¶26).

On February 5, 2015, Plaintiff Acheron Capital's CEO, Jean-Michel Paul, sent an email to the Trustee stating, in part:

> I went to Litai and Steve has engaged in talks with Oral Beason. Bottom line that I can live with is that Litai agreed to provide Acheron services for an amount equivalent. That way your agreement with them is unchanged but Acheron is compensated. They ask in exchange for reconfirmation of certain aspects and for their contract to be put to the Judge shortly. Given our meeting I do not foresee this as a problem.

14

(DE 76 at ¶¶27-28 (citing to DE 76-28); DE 92 at ¶¶27-28).  Litai provided the policy optimization

services pursuant to an agreement that is reflected in the March 2015 Agreement.  (DE 76 at ¶29;

DE 92 at ¶29).  With respect to the agreement, the March 2015 Agreement states:

> By separate agreement, Acheron and Litai have agreed that in the event the Court
> approves both this Agreement and the Renewal Agreement; and within one (1)
> calendar year of the later of such approval, Litai will complete, at no additional
> expense to Acheron, the Trustee or any Keep Policy Investors, policy optimization
> for fifty (50) Keep Policies. In the second year of such approval, Litai will complete
> policy optimization for an additional fifty (50) Keep Policies. Acheron, subject to
> the Trustee's approval, which will not be unreasonably withheld, will select the
> Keep Policies (100 in total) that will be subject to this policy optimization. Litai
> will release the results of this policy optimization to Acheron and the Trust. Nothing
> herein is intended to in any way [to] limit, expand or otherwise define the scope of
> Litai's existing responsibilities under the Agreement and/or the Renewal
> Agreement.

(DE 46-3, § 10; DE 76 at ¶29; DE 92 at ¶29).

At the time the March 2015 Agreement was being negotiated, Plaintiff Acheron Capital

knew and understood that the Trustee disagreed that the Plaintiff Trusts were Keep Policy

Investors to whom the Trustee owed a fiduciary duty.[9]  (DE 76 at ¶31; DE 92 at ¶31).  On February

20, 2015, Plaintiff Acheron Capital's counsel prepared and circulated revisions to a draft of the

March 2015 Agreement, in which Plaintiff Acheron Capital's counsel added the following

language:

> WHEREAS, Acheron interprets the operative documents, including the Asset
> Purchase Agreements, pursuant to which Acheron purchased fractional interest[s]

---

[9] Plaintiffs cite to the Trustee's testimony to support that "the Trustee had not taken a definitive
position whether Acheron was or was not a Keep Policy Investor and owed fiduciary duties by the
Trustee." (DE 92 at ¶31) (citing DE 74-2, Ex.1, pp. 81:16-25, 82:1-17, 84:9-25, 85:1-12, 86, 89:1-
10-21-25, 90:1-25, 91:1-11).  The cited testimony, however, supports that the Trustee *had* taken a
definitive position that "Acheron" was *not* a Keep Policy Investor.  The Trustee testified that he
believed Dr. Paul acknowledged, when complaining about Acheron not having the same treatment
as Keep Policy Investors under the Renewal Agreement, that Dr. Paul knew the Trustee's position
was that Plaintiff Acheron Capital and the Acheron Trusts were not Keep Policy Investors.
(DE 74-2, Ex. 1, pp. 85:6-10; 88:17-89:9).

in Keep Policies, to require that Acheron be treated by the Trustee as a Keep Policy Investor and that the Trustee act as a fiduciary with respect to Acheron's interests, and whereas the Trustee disputes this interpretation.

("WHEREAS Language") (DE 76 at ¶31; DE 92 at ¶31).  When the Trustee's counsel proposed to delete the WHEREAS Language, Plaintiff Acheron Capital's counsel responded on February 26, 2015 as follows:

> <<SLS response – With respect to deleted Whereas, JMP feels strongly that his position needs to be articulated, and there is no harm if we say the Trustee disagrees [or we could say the Trustee does not necessarily agree]>>

(DE 76 at ¶32 (citing to DE 76-32 at 2); DE 92 at ¶32).  The final language that was incorporated into the March 2015 Agreement follows:

> WHEREAS, as a purchaser of fractional interests in Keep Policies, Acheron asserts that it has acquired all right, title and interest of the Keep Policy Investors in such policies, and therefore, stands in the shoes of the Keep Policy Investors with respect to such fractional interests, and therefore, is entitled to all of the same rights and benefits as the Keep Policy Investors under the Trust, the Servicing Agreement, the Renewal Agreement, and any further extension of the Servicing Agreement or new servicing agreement, an assertion with which the Trustee does not necessarily agree and as to which the Trustee reserves all rights including the right to contest these assertions, subject to the terms and conditions set forth in this Agreement. (March 2015 Agreement, Ex. 33, (Fifth Whereas Clause)

(DE 76 at ¶33 (citing to DE 76-33 at 2, Fifth Whereas Clause); DE 92 at ¶33).

On April 3, 2015, the Trustee provided to Plaintiff Acheron Capital's counsel a draft of the motion to approve both the Renewal Agreement and the March 2015 Agreement ("Draft Motion to Approve").  (DE 76 at ¶34 (citing to DE 76-34 at 1); DE 92 at ¶34).  The Draft Motion to Approve states, in relevant part, as follows:

> The significant changes contained in the Renewal Agreement are as follows:
>
> . . .
>
> • The discounted Administrative Fee for the holders of ten or more Keep Policy Investment Interests has been eliminated, and the Administrative Fee Credit is

payable only with respect to persons or entities who first held their interest in a Keep Policy during the Receivership, and not subsequent purchasers.

. . .

When the Renewal Agreement was negotiated, Acheron raised certain concerns with regard to its interest in the Trust's policies. After extensive negotiations, those concerns have been resolved through the entry (subject to this Court's approval) of the Agreement which is attached hereto as Exhibit "B" [- the March 2015 Agreement]. The significant terms of the Trustee's Agreement with Acheron are as follows:

. . .

- The Trustee will not grant any rights, benefits or credits to other investors in Keep Policies that are not extended to Acheron on the same terms;

- Acheron will have the right to participate in the negotiation of any further extension of the Renewal Agreement or new servicing agreement, and any such extension or new agreement shall provide the same treatment to Acheron as other investors in Keep Policies;

. . .

[T]he Trustee does not believe it is unreasonable for Acheron to request some certainty with regard to future modifications of the Servicing Agreement, assuming it continues to purchase policies as it has been doing. Indeed, the Trustee does not believe that any of the terms of the Agreement are in any way inconsistent with the Trust Agreement or Servicing Agreement, as amended.

(DE 76-34; DE 76 at ¶34; DE 92 at ¶34).  On April 7, 2015, Plaintiff Acheron Capital's counsel responded: "[W]e are fine with [the] motion."  (DE 76-35; DE 76 at ¶34; DE 92 at ¶34).  At no point did the Acheron Trusts object or assert that the Renewal Agreement needed to be modified to provide for a subsidy to the Acheron Trusts in order to comply with the March 2015 Agreement. (DE 76 at ¶35 (citing to DE 45 at 9; DE 76-38 at 9); DE 92 at ¶35).  The Acheron Entities had notice of the Draft Motion to Approve and did not raise an objection that an Administrative Fee Credit had to be provided in favor of the Acheron Trusts in order to comply with the March 2015 Agreement.  (DE 76 at ¶35 (citing to DE 45 at 9; DE 76-38 at 9); DE 92 at ¶35).

On April 20, 2015, the Trustee filed the Renewal Agreement and the March 2015 Agreement for Court approval at the same time and in the same motion ("Approval Motion") (SEC DE 2500), which motion the Court granted (SEC DE 2501). (DE 76 at ¶37; DE 92 at ¶37). The Approval Motion contained the exact same language as quoted above from the Draft Motion to Approve. (SEC DE 2500). Plaintiffs acknowledge that, at some point in 2015, the Plaintiff Trusts stopped receiving the Administrative Fee Credit. (DE 76 at ¶38; DE 92 at ¶38).

The March 2015 Agreement begins with: "This Agreement, dated as of March 19, 2015, is entered into by and among Barry Mukamal, as Trustee ('Trustee') of the Mutual Benefits Keep Policy Trust (the 'Trust'), and Acheron Capital, Ltd. ('Acheron')." (DE 46-3 at 2; DE 76-33 at 2; DE 76 at ¶43; DE 92 at ¶43). The third WHEREAS clause of the March 2015 Agreement states as follows: "WHEREAS, Acheron Capital Ltd. or clients advised by Acheron (collectively 'Acheron') have purchased interests in Keep Policies as a result of Disposition Services conducted by Litai." (DE 46-3 at 2; DE 76-33 at 2; DE 76 at ¶43; DE 92 at ¶43). The signature portion of the March 2015 Agreement reflects the following:

**IN WITNESS WHEREOF,** the Trustee and Acheron have caused their names to be signed hereto by the undersigned duly authorized persons as of the day and year first above written.

TRUSTEE:

BARRY MUKAMAL

Barry Mukamal, as Trustee, and not individually

ACHERON:

ACHERON CAPITAL, LTD.

By: CARLO POLLER    DIRECTOR
(Print Name & Title)

(DE 46-3 at 9).

18

Section 15 of the March 2015 Agreement states, in part, that: "This Agreement provides no rights or interests in any person or entity not a party to this Agreement."  (DE 46-3 at § 15; DE 76-33 at § 15; DE 76 at ¶44; DE 92 at ¶44).  The "Notices" provision of the March 2015 Agreement lists only Acheron Capital, Ltd.  (DE 46-3 at § 13; DE 76-33 at § 13; DE 76 at ¶44; DE 92 at ¶44).  The "Assignment" provision of the March 2015 Agreement provides that "Acheron may transfer or have its clients transfer their interests in Keep Policies to other entities for which Acheron serves as an investment manager or advisor."  (DE 46-3 at § 18; DE 76-33 at § 18; DE 76 at ¶44; DE 92 at ¶44).

Only the Trustee and Acheron Capital are signatories to the March 2015 Agreement.  (DE 76 at ¶22; DE 92 at ¶22; DE 76-33 at 9).  No Plaintiff ever provided the Trustee with a power of attorney or consent that conferred on Acheron Capital the status of agent for the purpose of the March 2015 Agreement.  (DE 76 at ¶47; DE 92 at ¶47).  On April 1, 2021, the Operations Officer and a Director of Plaintiff Acheron Capital, Carlo Toller, attested that Acheron Capital, "acting in its capacity as the investment manager *and agent* of the Acheron Trusts, executed the March 19, 2015 Agreement.  (DE 92 at ¶64; DE 92 at 13-14, ¶¶2, 4 (emphasis added)).  Mr. Toller also attested: "I am the individual who executed the March 19, 2015 Agreement on behalf of Acheron Capital, acting in its capacity as the investment manager for and *agent of* the Acheron Trusts." (DE 92 at 14, ¶5) (emphasis added).

Section 2 of the March 2015 Agreement provides:

> The Trustee will not grant or otherwise offer to any other investors in Keep Policies, including Keep Policy Investors, any rights, disbursements, rebates, benefits, credits (through an Administrative Fee Credit or otherwise) or any other distribution of the Overpayment Balance or other consideration, that the Trustee does not grant or offer to Acheron with respect to its interests in Keep Policies on the same terms, whether as part of the existing Servicing Agreement, the Renewal Agreement, or through the Trustee's administration of the Trust.

19

(DE 74 at ¶23; DE 90 at ¶23; DE 76 at ¶45; DE 92 at ¶45). Section 4 of the March 2015 Agreement specifically provides that "the Trustee acknowledges that he will not "seek to sell a policy in which Acheron [already] owns an interest . . . without first extending to Acheron the opportunity to buy other interests in the policy pursuant to the Disposition Services routinely conducted by the Servicer"; Section 5 specifically provides only that the Trustee will "continue to follow current practices and procedures with respect to extending to Acheron the opportunity to buy any policy in which Acheron already owns a fractional interest before the Trustee allows the policy to lapse[.]" (DE 76 at ¶48; DE 92 at ¶48). The entirety of Section 5 of the March 2015 Agreement provides:

> The Trustee and Acheron will continue to follow current practices and procedures with respect to extending to Acheron the opportunity to buy any policy in which Acheron already owns a fractional interest before the Trustee allows the policy to lapse, provided the Trustee is made aware of the impending lapse by the Servicer in sufficient time to comply with this provision.

(DE 76 at ¶46; DE 92 at ¶46). At no point in time has the Trustee ever sold a policy in which the Acheron Trusts already own an interest without first extending to them the opportunity to buy other interests in the policy pursuant to the disposition services routinely conducted by Litai. (DE 76 at ¶50; DE 92 at ¶50). Additionally, at no point has the Trustee ever allowed a policy in which the Acheron Trusts already own a fractional interest to lapse without extending to the Acheron Entities the opportunity to buy the policy. (DE 76 at ¶51; DE 92 at ¶51).

Section 7 of the March 2015 Agreement provides for termination if Plaintiff Acheron Capital "fails or declines to continue purchasing policy interests offered for sale by the Trust during the term of the Renewal Agreement . . .." The March 2015 Agreement acknowledges that the Trustee and Litai entered into the Renewal Agreement and required the Trustee to seek Court

approval of both agreements pursuant to Section 9 of the agreement.  (DE 76 at ¶49; DE 92 at ¶49).

With respect to the dispositions of defaulted interests to the Acheron Trusts, the transactions were initiated with an offering sheet.  (DE 76 at ¶52; DE 92 at ¶52).   Each of the offering sheets provided in connection with the "dispositions" by which the Acheron Trusts acquired interests in policies from the Trustee clearly reflected the premium period and the amount of premium obligation associated with that premium period included in the purchase price for each interest being offered.  (DE 76 at ¶53; DE 92 at ¶53).  When the premium period was for a time period that predated the disposition, that was reflected in the offering sheet.  *Id.*  The Acheron Trusts paid the purchase price requested by the Trustee, which included the amount of premium obligation, without question or protest for each disposition both before and after March 2015. (DE 76 at ¶54; DE 92 at ¶54).

In August 2017, a dispute arose between the Trustee and Acheron regarding the Trustee's removal of interests in a policy from Disposition #49 when the policy had matured before the transaction had closed.  (DE 76 at ¶55; DE 92 at ¶55).  The Trust's regular practice, both before and after the March 2015 Agreement, was to remove policy interests from dispositions if a maturity was discovered before the transaction was closed, as occurred in Dispositions #30, #47 as well, and earlier in Disposition #49 itself.  *Id*.  In late October 2017, the Trustee advised Acheron that one of the original investors in a policy at issue, whose interest had been forfeited, was asserting an entitlement to the maturity proceeds.  (DE 76 at ¶56; DE 92 at ¶56).  The Trustee and Acheron ultimately reached a resolution of the dispute, which was confirmed by an email agreement dated March 29, 2018, pursuant to which the parties (a) agreed to a division of the maturity proceeds attributable to the interest among the claimant and Acheron; and (b) the Acheron Trusts agreed to

waive and release any claim to the other policy interests that had been previously removed from Disposition #49. *Id*.

In May 2018, Acheron first raised an issue as to the inclusion of premium obligations in the disposition purchase price as to premiums for the period between the new premium coverage period date and the disposition closing date. (DE 76 at ¶57; DE 92 at ¶57). Beginning with Disposition #51 on May 10, 2018, after negotiations and discussions, the Trustee began to credit the Acheron Trusts for the portion of purchase price that included premium from prior to the new premium coverage date, and proposed changes in the disposition process and asset purchase agreement to ensure that the transactions with the Acheron Entities would close as of the premium anniversary date for each interest included in the disposition. (DE 76 at ¶58; DE 92 at ¶58). Beginning with disposition #52 on August 15, 2018, these changes were implemented. *Id*.

At no point in time have the Acheron Trusts ever requested that the Trust defer their obligation to pay premiums on policy interests they acquired or advance Trust funds to pay such premiums. (DE 76 at ¶59; DE 92 at ¶59). The Trustee, through his ongoing review of Litai's performance under the Servicing Agreement learned that the Acheron Trusts – without the Trustee's express consent or acknowledgment – have routinely been provided more time to pay their premium obligations than the Keep Policy Investors are provided before their interests are deemed forfeited for non-payment. (DE 76 at ¶60; DE 92 at ¶60). Indeed, the Trustee disclosed in his Annual Trust Reporting that, for the period from October 1, 2016 through and including September 30, 2017 a finding that "[a]ll premium payments from the four major investors / policy interest purchasers are received on an average of 100 days following the invoice date." (SEC DE 2580-2 at 9; DE 92 at ¶59; DE 76 at ¶61).

In December 2018, Plaintiffs filed their Complaint (DE 1).  Only the Plaintiff Trusts and Plaintiff Acheron Capital were plaintiffs (DE 1).  On August 13, 2020, Plaintiffs filed their Third Amended Complaint (DE 46).  Only the Plaintiff Trusts and Plaintiff Acheron Capital were plaintiffs (DE 46).  (DE 76 at ¶62; DE 92 at ¶62).

## SUMMARY JUDGMENT STANDARD

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  An issue of fact is "material" if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1313 (11th Cir. 2007) (citing *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir.1996)).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1311 (11th Cir. 2018) (internal quotation marks omitted) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

Initially, it is the moving party's "burden to demonstrate the basis for its motion, and [it] must identify the portions of the record 'which it believes demonstrates the absence of a genuine issue of material fact.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  "The movant may meet this burden by demonstrating that the nonmoving party has failed to present sufficient evidence to support an essential element of the case." *Id.* (citing *Celotex*, 477 U.S. at 322-23).  *See also Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (The movant may satisfy its burden "by 'showing' or 'pointing out' to the Court that there is an absence

of evidence to support the non-moving party's case." (citing *Celotex*, 477 U.S. at 325)).  Provided that the moving party meets its burden, the burden then shifts to the non-moving party to show that a genuine issue of material fact exists.  *Hornsby-Culpepper*, 906 F.3d at 1311-12.

To establish a dispute of fact sufficient to avoid the entry of summary judgment, the non-moving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial."  *A.L. ex rel. D.L. v. Walt Disney Parks & Resorts US, Inc.*, 900 F.3d 1270, 1289 (11th Cir. 2018) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "However, a mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." *Kesinger ex rel. Estate of Kesinger v. Herrington*, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing *Anderson*, 477 U.S. 242).  Nevertheless, courts "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party."  *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997) (citation omitted).  Moreover, all reasonable doubts regarding the facts must be resolved in favor of the non-moving party.  *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008) (citation omitted).

The same standards apply for cross-motions for summary judgment as when only one party files a motion for summary judgment.  *See Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005).  "Cross-motions for summary judgment will not, in themselves, warrant the court [ ] granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed."  *Espinoza v. S. Beach Assocs., LLC*, No. 20-22873-CIV, 2020 WL 7244977, at *2 (S.D. Fla. Dec. 9, 2020) (citing *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984)).  "Thus, a court must consider each motion on its own merits,

resolving all reasonable inferences against the party whose motion is under consideration." *Id.* (citing *Am. Bankers Ins. Grp.*, 408 F.3d at 1331).

**ANALYSIS**

Plaintiffs move for partial summary judgment on two issues: (1) Whether Plaintiffs are Keep Policy Investors under the Trust Agreement ("Whether Plaintiffs are KPIs"); and (2) Whether Plaintiffs have a right, pursuant to the March 2015 Agreement, to the Administrative Fee Credit that the Trust stopped granting in 2015 ("Whether Plaintiffs are Entitled to the AFC"), (collectively, "Plaintiffs' Two Issues"). (DE 75 at 1-2). Defendant moves for summary judgment as to all Counts. (DE 77 at 2). I turn first to Defendant's MSJ on all Counts before turning to Plaintiffs' Two Issues.

## I.    DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

I find that, based on the undisputed facts, Plaintiffs cannot prove their claims. As such, I find that Defendant is entitled to summary judgment in his favor as to all Counts.

Defendant first raises issues as to whether the Plaintiff Trusts have capacity to sue and whether the Plaintiff Trusts have standing to bring Count 1. (DE 77 at 4). I address these issues below as a preliminary matter before turning to the merits of each of the Counts.

### A.  Whether Claims Brought Directly by Plaintiff Trusts Fail

Having considered the record and the parties' arguments, I find that that the Plaintiff Trusts' claims should not be dismissed on the basis that the Plaintiff Trusts, rather than the trustee of the Plaintiff Trusts, brought this action. Rather, if the case moves forward, Plaintiffs should be allowed to join or substitute the trustee of the Plaintiff Trusts. Defendant argues that, because no trustee brings this action on behalf of the Plaintiff Trusts and because the Plaintiff Trusts do not have the power to sue under Florida law, the claims must be dismissed as to the Plaintiff Trusts.

(DE 77 at 3-4). Defendant cites authority for the rule that, under Florida law, a trust cannot litigate on its own behalf; rather, the trustee must assert claims on behalf of the trust as the real party in interest. *Id.* at 4 (citing Fla. Stat. § 736.0811; *Buerki v. Lochner*, 570 So. 2d 1061, 1063 (Fla. 2d DCA 1990); *Abromats v. Abromats*, 16-CV-60653, 2016 WL 4917153, at *13 (S.D. Fla. Sept. 15, 2016)).

Plaintiffs do not contend that the rule is otherwise. Rather, Plaintiffs respond that, under Federal Rule of Civil Procedure 17(a), "[t]he court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action." (DE 91 at 3) (citing, among other authority, Fed. R. Civ. P. 17(a)(1)(E) & (3)). Specifically, Plaintiffs propose joining the trustee of the Plaintiff Trusts, Robert Edelstein. *Id.* at 2-3. Plaintiffs also argue that Defendant should have raised the issue of capacity to sue in an appropriate pleading in order to not have it be deemed waived. *Id.* at 3 (citing Fed. R. Civ. P. 9(a)(1)(A) & (2); *Morgan Guaranty Trust Co. v. Blum*, 649 F.2d 342, 345 (5th Cir. Unit B 1981)).[10] Furthermore, Plaintiffs contend that, to the extent that the Court finds the issue has not been waived, the Court should deny Defendant's request to dismiss the claims and allow joinder and/or substitution as contemplated by Rule 17. *Id.* at 4. I agree. Moreover, Defendant does not argue against Plaintiffs' proposal in his reply. Therefore, I do not recommend dismissal of the Plaintiff Trusts claims on the basis that the trustee for the Plaintiff Trusts did not bring this action on their behalf and further recommend that the Court allow joinder and/or substitution pursuant to Fed. R. Civ. P. 17 if warranted.

---

[10] "Decisions of the Fifth Circuit handed down prior to the close of business on September 30, 1981, are binding precedent in the Eleventh Circuit." *United States v. Jeune*, No. 19-13018, 2021 WL 3716406, at *8, n.5 (11th Cir. Aug. 23, 2021) (citing *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc)).

### B.  Whether Plaintiff Trusts' Claim for Breach of the March 2015 Agreement Fails[11]

[11] Defendant's reply to his MSJ argues that the Plaintiff Trusts lack standing to enforce the March 2015 Agreement because my Report and Recommendation in the Arbitration Action, which was entered on April 6, 2021, determined that "[the Plaintiff Trusts] . . . are not parties to the March 2015 Agreement . . . and are not third party beneficiaries of the March 2015 Agreement."  (DE 97 at 2-3) (citing Arbitration Action DE 32).  Defendant's reply, however, lacks any argument about whether Plaintiff Acheron Capital acted as agent for the Plaintiff Trusts.  In the Arbitration Action, Plaintiffs did not allege in their Petition to Compel Arbitration and Request for Hearing (Arbitration Action DE 1) that Plaintiff Acheron Capital acted as agent for the Plaintiff Trusts in executing the March 2015 Agreement.  Rather, Plaintiffs alleged only that Plaintiff Acheron Capital "serves as the investment manager for each of the other Plaintiffs."  (Arbitration Action DE 1 at ¶6).  In responding to Defendant's motion to dismiss filed in the Arbitration Action and addressing the issue of the Plaintiff Trusts' standing to enforce the March 2015 Agreement, Plaintiffs again reiterated that Plaintiff Acheron Capital "serves as the investment manager for each of the other Plaintiffs, the four Acheron Trusts."  (Arbitration Action DE 18 at 15-17).  Plaintiffs, however, still did not affirmatively assert that Acheron Capital acted as agent for the Plaintiff Trusts in executing the March 2015 Agreement.  *Id.*  In the end, for the reasons stated therein, the Report and Recommendation determined that "Acheron Capital's argument that its role as investment manager for the Trust Plaintiffs confer[ed] upon it agency status with respect to the March 2015 Agreement fail[ed]."  (Arbitration Action DE 32 at 12).  On April 27, 2021, Plaintiffs filed their objections to the Report and Recommendation attaching *for the first time in that action* the Declaration of Carlo Toller, Operations Officer and Director of Plaintiff Acheron Capital, dated April 1, 2021, wherein Mr. Toller attested to executing the March 2015 Agreement on behalf of Plaintiff Acheron Capital "acting in its capacity as the investment manager for *and agent of* the Acheron Trusts."  (Arbitration Action 35-1 at 2-4:¶¶1-5).  On April 1, 2021, Plaintiffs responded to Defendant's statements of facts supporting his MSJ in the instant action and acknowledged that they provided no power of attorney or consent conferring on Plaintiff Acheron Capital the status of agent for the purpose of the March 2015 Agreement.  (DE 92 at ¶47).  Plaintiffs asserted, however, in an improper manner, the additional fact that "the Trustee was aware that Acheron Capital was acting as agent for the Acheron Trusts in connection with all APAs and the March 2015 Agreement." *Id.* at ¶47 (citing, in part, Toller Declaration, DE 92 at 13-15).  Plaintiffs then properly asserted an additional fact separately, which stated that "Acheron Capital executed the March 2015 Agreement in its capacity as the investment manager for *and agent of* the Acheron Trusts" and attached Mr. Toller's declaration.  *Id.* at ¶64 (citing Toller Declaration, DE 92 at 13-15:¶¶4-5) (emphasis added).  Defendant did not respond to this assertion.  In other words, there is now additional evidence (in the form of the Toller Declaration) on the question of Acheron Capital's agency that was not before me at the time I entered my Report and Recommendation in the Arbitration Action.  For this reason, and for reasons further explained herein, I conclude that Defendant's MSJ should be denied to the extent it is based on the Plaintiff Trusts lacking standing as principals to enforce the March 2015 Agreement.  There is now a genuine dispute of material fact as to whether  Plaintiff Acheron Capital signed the March 2015 Agreement as agent for Plaintiff Trusts, which, if resolved in the Plaintiffs' favor, would confer standing on the Plaintiff Trusts to enforce the agreement.

Defendant contends that Plaintiff Trusts' claim for breach of the March 2015 Agreement must fail because Plaintiff Trusts are not parties to that agreement, and thus cannot seek to enforce that agreement.  (DE 77 at 4).  Plaintiffs respond that the Plaintiff Trusts have standing to enforce their breach of contract claims either because Acheron Capital (who is clearly a party to the March 2015 Agreement) was acting as Plaintiff Trusts' agent or because Plaintiff Trusts were third-party beneficiaries of the March 2015 Agreement.  (DE 91 at 3-6).  I find that no triable issue exists regarding the Plaintiff Trusts' lack of status as third-party beneficiaries.  However, I do find that the evidence creates an issue of material fact as to whether Acheron Capital signed the March 2015 Agreement as agent for the Plaintiff Trusts thus conferring upon them an ability to enforce the agreement as principals.  Therefore, rejection of the Plaintiff Trusts' claim for breach of the March 2015 Agreement on the basis that they cannot enforce it as non-parties is inappropriate at this juncture.  I address findings with respect to the issue of standing under third-party beneficiary and agency principles below.

### 1.   Plaintiff Trusts' Claim Fails Under Third-Party Beneficiary Theory

I conclude that the Plaintiffs Trusts' claim for breach of the March 2015 Agreement as third-party beneficiaries to that agreement fails for two reasons: (i) the Plaintiffs failed to plead a third-party breach of contract claim; and (ii) the record evidence demonstrates that there is no genuine issue of material fact regarding the Plaintiff Trusts' lack of status as third-party beneficiaries to the March 2015 Agreement.  I analyze Plaintiffs' failure to plead before turning to the Plaintiff Trusts' lack of status as third-party beneficiaries.

"[A] plaintiff [i]s not entitled to assert a new claim or fundamentally change the nature of an existing claim in the midst of summary judgment[.]"  *Berene v. Nationstar Mortg., LLC*, 800 F. App'x 756, 760 (11th Cir. 2020) (interpreting the holding in *Hurlbert v. St. Mary's Health Care*

*Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006)); *see also Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment."). To make a claim for breach of a third-party beneficiary contract under Florida Law, a plaintiff must allege, *inter alia*, that "the clear or manifest intent of the contracting parties [was] that the contract primarily and directly benefit the third party." *FL-7, Inc. v. SWF Premium Real Est., LLC*, 259 So. 3d 285, 288 (Fla. 2d DCA 2018). Here, as Defendant argues, Plaintiffs failed to allege that the March 2015 Agreement "primarily and directly benefit[ed]" the Plaintiff Trusts. Doing so now is like bringing a new claim. *Joseph M. Still Burn Centers, Inc. v. Liberty Mut. Ins. Co.*, No. CV 108-090, 2010 WL 55471, at *10 (S.D. Ga. Jan. 6, 2010) (finding that "Plaintiff has raised a new claim by asserting, for the first time on summary judgment, a third party beneficiary claim"). Therefore, I conclude that the Plaintiff Trusts cannot pursue the breach of contract claim as third-party beneficiaries.[12]

Nonetheless, even if Plaintiffs had pled a proper cause of action, there is no evidence in the record that the parties or the March 2015 Agreement itself expressed intent to benefit the Trust Plaintiffs. It is undisputed that the Plaintiff Trusts are not signatories to the March 2015

---

[12] Plaintiffs' contention that Plaintiff Acheron Capital acted as agent for the Plaintiff Trusts is distinguishable, and I do not find that Plaintiffs' argument about agency qualifies as a "new claim" within the meaning that the *Gilmour* Court ascribed to a "new claim." *Gilmour*, 382 F.3d at 1314-15. Indeed, the *Gilmour* Court instructed that the issue with asserting a new claim at summary judgment is one of notice. *Id.* With respect to Plaintiff Acheron Capital acting as agent for the Plaintiff Trusts, as discussed *infra*, Florida law allows a principal to bring an action in their name or in the name of their agent. *Impossible Elec. Techniques, Inc. v. Wackenhut Protective Sys., Inc.*, 610 F.2d 371, 372 (5th Cir. 1980) ("Florida authority establishes that a party may contract in the name of an agent and that having done so he may thereafter sue under the contract in his own name as the real party in interest."). By virtue of the Plaintiff Trusts appearing from the time of the original Complaint (DE 1) as named plaintiffs, Defendant had notice that they were asserting the claims directly. Defendant did not, however, have notice that the Plaintiff Trusts claimed status as third-party beneficiaries of the March 2015 Agreement because Plaintiffs never alleged that the agreement was made to primarily and directly benefit the Plaintiff Trusts or otherwise pled that they were bringing third-party beneficiary claims.

Agreement.  (DE 76 at ¶22; DE 92 at ¶22; DE 76-33 at 9).  If Plaintiff Trusts are non-parties as a result of being non-signatories, the Plaintiff Trusts cannot enforce the agreement unless an exception applies.  *Katchmore Luhrs, LLC v. Allianz Glob. Corp. & Specialty*, No. 15-CIV-23420, 2017 WL 432671, at *7 (S.D. Fla. Jan. 31, 2017) (finding no privity between the litigants and no obligations owed by defendant to plaintiff under an agreement where one litigant was found to be a non-party to the agreement) (citation omitted); *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009) (quoting Williston on Contracts § 57.19, p. 183 (4th ed. 2001) for the proposition that "'traditional principles' of state law allow a contract to be enforced by or against nonparties to the contract through 'assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel'").

"A party is an intended beneficiary only if the parties to the contract clearly express, or the contract itself expresses, an intent to primarily and directly benefit the third party or a class of persons to which that party claims to belong."  *Caretta Trucking, Inc. v. Cheoy Lee Shipyards, Ltd.*, 647 So. 2d 1028, 1031 (Fla. 4th DCA 1994).  "The existence of a clear and unambiguous contract is the best evidence of the intent of the parties, and its meaning and legal effect are questions of law for determination by the court."  *Jaar v. Univ. of Miami*, 474 So. 2d 239, 242 (Fla. 3d DCA 1985) (citation omitted).  "[I]n order to infer intent, the third party beneficiary need not necessarily be named in the contract."  *Steadfast Ins. Co. v. Corp. Prot. Sec. Grp., Inc.*, 554 F. Supp. 2d 1335, 1338 (S.D. Fla. 2008) (citing *Florida Power & Light Co. v. Mid–Valley, Inc.*, 763 F.2d 1316, 1321 (11th Cir.1985).  "The intent may be inferred by the pre-contract and post-contract actions of the parties."  *Id.*  "If the contract does not expressly provide for the third party beneficiary, however, the litigant must clearly show that both parties to the contract intended its beneficiary status."  *Id.* (citing *Nova Info. Sys., Inc. v. Greenwich Ins. Co.*, 365 F.3d 996, 1003

(11th Cir.2004) and *Caretta Trucking, Inc.*, 647 So.2d at 1031 ("It is insufficient to show that only

one party unilaterally intended to benefit the third party")).

Plaintiffs argue that a recital ("Recital") in the March 2015 Agreement defining "Acheron"

as "Acheron Capital, Ltd. or clients advised by Acheron" indicates that the parties expressly

intended the March 2015 Agreement to benefit the Plaintiff Trusts, as Plaintiff Acheron Capital's

clients.  (DE 91 at 5-6). The "whereas" clauses cited by Plaintiffs in their response to support that

the agreement was made to benefit the Plaintiff Trusts are as follows:

> WHEREAS, Acheron Capital, Ltd. or clients advised by Acheron (collectively "Acheron") have purchased interests in Keep Policies . . .
>
> WHEREAS, as a purchaser of fractional interests in Keep Policies, Acheron asserts that it has acquired all right, title and interest of the Keep Policy Investors in such policies, and therefore, stands in the shoes of the Keep Policy Investors with respect to such fractional interests, and therefore, is entitled to all of the same rights and benefits as the Keep Policy Investors under the Trust, the Servicing Agreement, the Renewal Agreement, and any further extension of the Servicing Agreement or new servicing agreement, an assertion with which the Trustee does not necessarily agree and as to which the Trustee reserves all rights including the right to contest these assertions, subject to the terms and conditions set forth in this Agreement; and
>
> WHEREAS, Acheron has expressed certain concerns with the application of some of the terms of the Renewal Agreement to Acheron, and with the process for further extension, renewal or replacement of the Servicing Agreement; and
>
> WHEREAS, Acheron wishes to continue to acquire or have its current or future clients acquire interests in Keep Policies as may be sold by the Trust, and the Trustee wishes for Acheron to remain an interested purchaser in such interests.
>
> (DE 46-3 at 2).

Plaintiffs contend that the above clauses necessitate a finding that the March 2015

Agreement expressly benefits the Plaintiff Trusts because, in determining the contracting parties'

intent, a court must "examine the contract as a whole and must 'reach an interpretation consistent

with reason, probability, and the practical aspects of the transactions between the parties.'"  (DE 91

at 5) (quoting *Bucacci v. Boutin*, 933 So. 2d 580, 585 (Fla. 3d DCA 2006)).  Plaintiffs argue that

the practical aspects of the transaction leading to the execution of the March 2015 Agreement and the fact that Plaintiff Acheron Capital has no ownership interests to protect make imperative a finding that the Plaintiff Trusts can enforce the agreement.  (DE 91 at 5-6).

Plaintiffs' argument is unavailing for several reasons.  First, Plaintiff Acheron Capital's lack of ownership in fractional interests held by the Trust is not determinative to whether the March 2015 agreement expresses an intent to benefit the Plaintiff Trusts.  The parties or the agreement must "clearly express . . . an intent to primarily and directly benefit the [Plaintiff Trusts]."  *Caretta Trucking, Inc.*, 647 So. 2d at 1031.  Plaintiff Acheron Capital's lack of ownership does not equate to an expression of intent to benefit the Plaintiff Trusts.  Furthermore, while Plaintiffs contend that the agreement was entered into for the Plaintiff Trusts' benefit as owners (DE 91 at 5), the recitals indicate that Plaintiff Acheron Capital could itself own interests in the Trust.  Also, the last recital, which states that "Acheron wishes to continue to acquire or have its current or future clients acquire," speaks squarely to Plaintiff Acheron Capital acquiring *or* directing its clients to acquire the subject interests.  As the record evidence demonstrates, Plaintiff Acheron Capital is the one who has clients.  (DE 91 at 5; DE 92 at ¶65).  Thus, the fact that Plaintiff Acheron Capital currently has no ownership interests in the Trust does not, without more, transform the recitals in the March 2015 Agreement into a clear expression of intent to primarily and directly benefit the Plaintiff Trusts especially when said recitals expressly provide that Plaintiff Acheron Capital could be the acquirer.

Second, Plaintiffs are incorrect in asserting, for purposes of demonstrating that the agreement expressly intended to benefit the Plaintiff Trusts, that Plaintiff Acheron Capital signed the March 2015 Agreement in a representative capacity.  The agreement is signed by Carlo Toller as "Director" for Plaintiff Acheron Capital.  Plaintiff Acheron Capital signed for "Acheron."  The

agreement begins by defining "Acheron" as Plaintiff Acheron Capital.  Therefore, on its face, the

March 2015 Agreement itself reflects that Plaintiff Acheron Capital did not sign on behalf of

others.

Third, as Defendant correctly argues, recitals are not part of the contract as a matter of law

and are disregarded to the extent inconsistent with a contract's substantive terms.  (DE 77 at 5).

Although Plaintiffs argue that the Recital definition of "Acheron" "is *not inconsistent* with the rest

of the contract" (DE 91 at 5), it is clearly different than the definition at the beginning of the

agreement; therefore, it *is inconsistent* with the substantive parts of the agreement.  The definition

of "Acheron" is unambiguously stated in the beginning of the agreement to be "Acheron Capital,

Ltd."  Furthermore, as Defendant argues, other substantive provisions of the agreement (such as

those referring to Acheron and its clients) support the definition of "Acheron" as "Acheron Capital,

Ltd."  "'[W]hereas' clauses are not binding when the contract is otherwise unambiguous[;] . . .

[t]hey are merely prefatory recitations of the facts that lead the parties to enter the agreement."

*Whetstone Candy Co. v. Kraft Foods, Inc.*, 351 F.3d 1067, 1074 (11th Cir. 2003) (hereinafter,

*Whetstone*) (citing *Johnson v. Johnson*, 725 So. 2d 1209, 1212-13 (Fla. 3d DCA 1999)); *In re*

*Advanced Telecomm. Network, Inc.*, No. 6:03-BK-299-KSJ, 2010 WL 3929053, at *4 (M.D. Fla.

Aug. 31, 2010), *aff'd*, 429 F. App'x 857 (11th Cir. 2011) ("The recitals to a contract generally are

not part of the agreement.")).  Here, because I find the contract is otherwise unambiguous, the

recitals are not binding.

Fourth, I find it unremarkable that the Recital defined "Acheron" separately for purposes

of the recitals section of the March 2015 Agreement.  Indeed, the Recital definition in question

dispenses with the need to spell out "Acheron Capital, Ltd. or clients advised by Acheron"

throughout the rest of the recitals as the parties make their introductory statements to the

agreement.  As the *Whetstone* court held, the recitals are mere prefatory statements of the facts leading to the agreement.  As such, a separate definition of "Acheron" for purposes of the recitals is *not* in conflict with the substantive parts of the March 2015 Agreement when viewed in this light.

Because I find that Plaintiffs fail to show that the parties express or the March 2015 Agreement itself expresses "an intent to primarily and directly benefit the [Plaintiff Trusts]," I conclude there is no basis for considering the Plaintiff Trusts to be third-party beneficiaries of the agreement.  *Caretta Trucking, Inc.*, 647 So. 2d at 1031.  Thus, I find that the Plaintiff Trusts do not have standing to enforce the March 2015 Agreement on grounds that they are third-party beneficiaries to the agreement even if they had pled a claim for breach of a third-party beneficiary contract, which they did not do.

## 2.  Plaintiff Trusts' Claim Survives Under Agency Theory

The record evidence indicates that a genuine issue of material fact precludes summary judgment in favor of Defendant as to the Plaintiff Trusts' ability to enforce the March 2015 Agreement under an agency theory.  "Essential to the existence of an actual agency relationship is (1) acknowledgment by the principal that the agent will act for him, (2) the agent's acceptance of the undertaking, and (3) control by the principal over the actions of the agent."  *Goldschmidt v. Holman*, 571 So. 2d 422, 424 (Fla. 1990) (finding that "the record [was] devoid of any evidence to support a finding of the third element").

"[T]here is no requirement under Florida law that a principal be specifically identified in a contract entered into by its agent in order for the principal to be bound by the contract.  To the contrary, a principal may enter into agreements in its own name or that of its agent."  *CC-Aventura, Inc. v. Weitz Co., LLC*, No. 06-21598CIV, 2007 WL 2176027, at *2 (S.D. Fla. July 25, 2007)

(citing *Ford v. Williams*, 62 U.S. 287, 21 (1858); *Love v. Brown Development Co. of Michigan*, 100 Fla. 1373, 131 So. 144 (Fla.1930); and *Moritt v. Fine*, 242 F.2d 128, 133 (Fla. 5th DCA 1957) (Brown, J. dissenting)). Thus, "[a] party may contract through an undisclosed agent[,] and . . . both the undisclosed agent and the [undisclosed] principal . . . may sue to enforce any rights under the contract." *U.S. Distributors, Inc. v. Block*, No. 09-21635-CIV-HUCK, 2010 WL 2612642, at *1 (S.D. Fla. June 29, 2010) (citing *El Jordan v. Solymar, S. De R.L.*, 315 F. Supp. 2d 1355, 1363–64 (S.D. Fla. 2004); Restatement (Third) of Agency § 6.03 (2006)).

"The determination of an agency relationship can be resolved by summary judgment only when the evidence is capable of just one interpretation." *Kobel v. Schlosser*, 614 So. 2d 6, 7 (Fla. 4th DCA 1993); *Am. Can Co. v. Horlamus Corp.*, 341 F.2d 730, 732 (5th Cir. 1965) (holding that the jury must pass on whether an undisclosed agency exists). Furthermore, "if the contracting party knows the identity of the principal for whom the agent purports to act, the principal is deemed to be disclosed. A dispute concerning such knowledge presents an issue of fact." *Van D. Costas, Inc. v. Rosenberg*, 432 So. 2d 656, 659 (Fla. 2d DCA 1983) (citations omitted).

Defendant argues that he was never provided with a power of attorney or consent from the Plaintiff Trusts conferring upon Plaintiff Acheron Capital the status of agent for purpose of the March 2015 Agreement. (DE 77 at 5). While Defendant acknowledges that Plaintiff Acheron Capital signed APAs as agent for specific contracting Plaintiff Trusts, he argues that, because Plaintiff Acheron Capital knew how to sign in a representative capacity but chose not to with respect to the March 2015 Agreement, Plaintiff Acheron Capital did not sign that agreement as agent for the Plaintiff Trusts. *Id.*

Contrary to what Defendant argues, Plaintiffs argue that Plaintiff Acheron Capital did sign as agent for the Plaintiff Trusts and that Defendant was aware of the nature of the relationship

between Plaintiff Acheron Capital and the Plaintiff Trusts. (DE 91 at 4-5). Specifically, Plaintiffs contend that Defendant has recognized that Plaintiff Acheron Capital acted on behalf of its clients to benefit their interests in the policies because Defendant attested that (i) the Trust sold defaulting fractional policy interests to the Plaintiff Trusts, which have been paid over $245 million in death benefits as a result, and (ii) Plaintiff Acheron Capital has never purchased policy interests from the Trust nor has it been on a maturity of a policy from the Trust. (DE 91 at 5). While Defendant certainly made these attestations, I find that other facts create a triable issue as to Plaintiff Acheron Capital executing the March 2015 Agreement as agent for the Plaintiff Trusts.

First, it is undisputed that Plaintiff Acheron Capital serves as the investment manager for the four Plaintiff Trusts. (DE 91 at 4; DE 92 at ¶65; Arbitration Action DE 13-1 at ¶3). As such, Defendant has acknowledged that Plaintiff Acheron Capital has historically acted as agent for Plaintiff Trusts by executing APAs for the various Plaintiff Trusts' purchases of defaulted viaticated policy interests from the Trust. (DE 77 at 5). Therefore, Plaintiff Acheron Capital is not a stranger to acting as agent for the Plaintiff Trusts.

Second, Plaintiffs have provided the declaration of Carlo Toller, the Operations Officer and Director of Plaintiff Acheron Capital, which attests specifically to Plaintiff Acheron Capital having executed the March 2015 Agreement in its capacity as investment manager *and agent for* the Plaintiff Trusts. (DE 92 at ¶64; DE 92 at 13-14, ¶¶2, 4-5). As reflected *supra*, Mr. Toller is the individual who signed the March 2015 Agreement as "Director" on behalf of Plaintiff Acheron Capital. In addition, Mr. Toller is the individual who has signed APAs for the purchase of interests from the Trust when Plaintiff Acheron Capital acted as agent for the Plaintiff Trusts. (DE 46-2 at 17). From these facts, it follows that Mr. Toller is knowledgeable about when and if Plaintiff Acheron Capital is acting as agent for the Plaintiff Trusts, and his declaration presents a genuine

issue of material fact given the parties dispute as to whether Plaintiff Acheron Capital signed the March 2015 Agreement as agent for the Plaintiff Trusts. In addition, to the extent that Plaintiffs intend to prove that the agency was disclosed, that is also a matter for the jury to decide. *Am. Can Co.*, 341 F.2d at 732; *Van D. Costas, Inc.*, 432 So. 2d at 659. Thus, I recommend that Defendant's MSJ be denied to the extent that it is based upon the Plaintiff Trust's lack of standing to enforce the March 2015 Agreement as principals, either disclosed or undisclosed.

### C.  Whether Defendant Breached the March 2015 Agreement (Count 1)

For the reasons set forth below, I find that Defendant is entitled to summary judgment on Count 1. Plaintiffs allege that Defendant breached Section 2[13] ("Section 2" or "Equal Rights Provision") and Section 5[14] ("Section 5" or "Right to Buy Provision") of the March 2015 Agreement by (a) providing other investors in Keep Policies rights and benefits that were not available to Acheron and (b) altering his "practices and procedures" in violation of his obligations

---

[13] Section 2 of the March 2015 Agreement provides:

> The Trustee *will not grant or otherwise offer* to any other investors in Keep Policies, including Keep Policy Investors, any rights, disbursements, rebates, *benefits*, credits (through an Administrative Fee Credit or otherwise) or any other distribution of the Overpayment Balance or other consideration, *that the Trustee does not grant or offer to Acheron with respect to its interests in Keep Policies* on the same terms, whether as part of the existing Servicing Agreement, the Renewal Agreement, or through the Trustee's administration of the Trust.

(DE 74 at ¶23; DE 90 at ¶23; DE 76 at ¶45; DE 92 at ¶45) (emphasis added).

[14] Section 5 of the March 2015 Agreement provides:

> The Trustee and Acheron will continue to follow current practices and procedures with respect to extending to Acheron the opportunity *to buy any policy* in which Acheron already owns a fractional interest *before the Trustee allows the policy to lapse*, provided the Trustee is made aware of the impending lapse by the Servicer in sufficient time to comply with this provision.

(DE 76 at ¶46; DE 92 at ¶46) (emphasis added).

under Sections 2 and 5 of the agreement to Plaintiffs' detriment.  (DE 46 at ¶¶9, 45).  Plaintiffs additionally allege that Defendant breached Section 2 by granting an Administrative Fee Credit to other investors in Keep Policies that was not granted to Plaintiffs.  (DE 46 at ¶¶66-68).

As an initial matter, the District Court previously dismissed Plaintiffs' claims with respect to Section 2 pertaining to Defendant delaying the sale of policy interests to Plaintiffs.  (DE 45 at 8).  Plaintiffs repeated these allegations in their Third Amended Complaint.  Specifically, Plaintiffs alleged that Defendant changed "practices and procedures" and caused defaulting investors to receive a benefit not extended to Plaintiffs by Defendant "delay[ing] his offers to sell interests in Keep Policies and . . .  delaying the closing of the sales of interests in Keep Policies" (the "Delay Period").  (DE 46 at ¶49).  Defendant's Delay Period was allegedly to Plaintiffs' detriment and allegedly violated the Equal Rights Provision by conferring a benefit on defaulting investors, but not Plaintiffs, because: (i) Plaintiffs were required to pay overdue premiums on policy interests for periods in which they did not own the interests and (ii) Plaintiffs were denied the opportunity to acquire valuable (matured) interests after they had been offered for sale.  In the second complained-of scenario, Plaintiffs alleged that, if a policy matured during the Delay Period, Defendant removed the policy interests from the sale and paid the proceeds to the defaulting investors.  (DE 46 at ¶¶45-65).  Thus, Defendant would pay a defaulting investor the proceeds of a matured policy even though that investor had not paid the premiums that were due.  (DE 46 at ¶58).  Furthermore, say Plaintiffs, only a defaulting investor could benefit from a maturity during the Delay Period; Plaintiffs could not benefit from such policy maturities.  *Id.*

In addressing these allegations in Plaintiffs' Second Amended Complaint, the District Court held that Plaintiffs "fail[ed] to state a claim that the Trustee's delays in offering the defaulting interests for sale to Acheron constitute a breach of section 2 of the March 2015

38

Agreement." (DE 45 at 8). Plaintiffs' allegations in the Third Amended Complaint regarding the delays in sale are materially the same as in the Second Amended Complaint. Therefore, the claims for breach of section 2 pertaining to the delays in sale fail for the same reasons the District Court already articulated, and I do not address these allegations further as to Section 2 of the March 2015 Agreement. I proceed by addressing Plaintiffs' claim for breach as to Section 5 before turning again to Section 2 and Plaintiffs' claim regarding the Administrative Fee Credit.

### 1. Breach of Section 5 – Changing Practices to Delay Sale of Interests

I find that Defendant is entitled to summary judgment as to the alleged breach of Section 5 of the March 2015 Agreement. This finding turns on the interpretation of Section 5's use of the word "policy." Plaintiffs alleged that the Trustee breached the Right to Buy Provision by changing his practices and delaying the sale of defaulting *interests* to Acheron. (DE 46 at ¶¶46-65). Defendant argues, as he did in seeking dismissal of the Second Amended Complaint, that Section 5 only addresses the sale of whole "policies" not fractional interests in those policies.[15] (DE 77 at 5-7). Plaintiffs had argued before the District Court that the March 2015 Agreement uses the words "policy" and "fractional interests in the policies" interchangeably. (DE 42 at 11). The District Court agreed with Defendant's position that the plain language of Section 5 "requires

---

[15] In his MSJ, Defendant argues in a footnote that the operative complaint "only alleges that [Defendant] began to delay the timing of his offers to sell to Plaintiffs *fractional interests* (¶45), thereby requiring Plaintiffs to pay overdue premiums for *fractional interests* (¶49) and extending a 'free option' to defaulting investors, 'to the detriment of [Plaintiffs] . . . (¶55)." (DE 77 at n.6) (emphasis in original). Defendant argues that Plaintiffs' interpretation of the provision as encompassing fractional interests "is antithetical to the plain language of Section 5." (DE 77 at n.6). Defendant also contends that the Right to Buy Provision "does not prohibit any change in 'practices and procedures' with regard to the disposition of fractional interests; it only provides that [Defendant] will continue to follow current practices and procedures 'with respect to extending to [Plaintiffs] the opportunity to buy [a subject policy] before [Defendant] allows the policy to lapse." (DE 99 at n.2).

[Defendant] to continue the practice of extending to Acheron the ability to purchase a *lapsing policy* in which Acheron already owns a fractional interest."[16]  (DE 45 at 10-11) (emphasis in original).  Nevertheless, the District Court deferred this issue to summary judgment "in the event the record evidence supports Acheron's position that there is an ambiguity in the use of the words policy and policy interests" in the March 2015 Agreement.  (DE 45 at 11).  Accordingly, the District Court stated: "[a]t summary judgment, the Court will determine if indeed an ambiguity exists, and whether parol evidence is required to determine the meaning of the word policy in section 5."  (DE 45 at 11).

 "Summary judgment is appropriate in a contract dispute where the contract is clear and unambiguous on its face."  *Panama Music, Corp. v. Universal Music Grp. Inc.*, No. 12-20200-CIV, 2013 WL 12310734, at *6 (S.D. Fla. July 9, 2013).  "Language whose meaning is otherwise plain is not ambiguous merely because the parties urge different interpretations in the litigation." *Id.* (internal quotation marks and citation omitted).

As the District Court previously determined, Section 5's plain language indicates that the provision applies to the purchase or lapse of entire policies, not fractional interests.  Plaintiffs offer no arguments, nor do they point to any record evidence to support the contention that the March 2015 Agreement uses the words "policy" and "policy interests" interchangeably or that the plain language of Section 5 is otherwise ambiguous.  Indeed, Plaintiffs do not even respond to Defendant's arguments pertaining to the interpretation of the Right to Buy Provision.  Defendant argues in his reply that, because "Plaintiffs fail to respond to the Trustee's argument in their

---

[16] The operative complaint acknowledged Defendant's position that: "section 4 [of the March 2015 Agreement] clarifies that where Acheron already owns a fractional interest, [Defendant] is obligated to give Acheron a right of first refusal to purchase additional interests," and "Section 4's use of the term 'interests in the policy' serves to show that section 5 was more limited in scope than Acheron suggests."  (DE 45 at 10).

Response[,] Summary Judgment must be granted on all of Plaintiffs' claims relating to any alleged change in 'practices and procedures' regarding disposition, whether as a breach of contract claim or otherwise." (DE 99 at 2-3). I agree.

Therefore, I find that Section 5 is unambiguous and conclude that the provision addresses policies and not policy interests. Moreover, Plaintiffs acknowledge that it "is not aware of any instance in which [Defendant] has ever allowed a *policy* in which the [Plaintiff Trusts] already own a fractional interest to lapse without extending to Acheron the opportunity to buy the *policy*." (DE 92 at ¶51) (emphasis added). Therefore, the record evidence is devoid of any facts indicating that Defendant breached Section 5 of the March 2015 Agreement. Consequently, I find that Defendant is entitled to summary judgement in his favor as to Plaintiffs' claim that Defendant breached Section 5 of the agreement by delaying the sale of *defaulting interests* to Plaintiffs.

### 2.   Breach of Section 2 – Failure to Pay Administrative Fee Credit[17]

For the reasons stated below, and consistent with the principles set forth herein, I find that Defendant is entitled to summary judgment in his favor on the issue of Plaintiffs' entitlement to the Administrative Fee Credit. Under Florida law, the interpretation of a contract is governed by the parties' intent. *Royal Oak Landing Homeowner's Ass'n, Inc. v. Pelletier*, 620 So. 2d 786, 788 (Fla. 4th DCA 1993). "The intent of the parties is derived from the language of the contract when such language is without ambiguity." *Royal Cont'l Hotels, Inc. v. Broward Vending, Inc.*, 404 So. 2d 782, 783–84 (Fla. 4th DCA 1981).

"[L]anguage being construed should be read in common with other provisions of the contract." *Royal Oak Landing Homeowner's Ass'n, Inc.*, 620 So. 2d at 788. Furthermore, "if

---

[17] Plaintiffs filed a cross-motion for summary judgment on the issue of their entitlement to the Administrative Fee Credit. (DE 91 at n.11; DE 75 at 11, 18-20).

clauses in a contract appear to be repugnant to each other, they must be given such an interpretation and construction as will reconcile them if possible." *Triple E Dev. Co. v. Floridagold Citrus Corp.*, 51 So. 2d 435, 438–39 (Fla. 1951).  In addition, "whenever possible a contract should receive such construction as will uphold it rather than render it invalid."   *Hunt v. First Nat. Bank of Tampa*, 381 So. 2d 1194, 1197 (Fla. 2d DCA 1980).  Also, "an interpretation leading to an absurd conclusion must be abandoned for one more consistent with reason and probability."   *Id.*  Moreover, courts may look to the parties' post-agreement conduct to discern intent.  *Hirsch v. Jupiter Golf Club LLC*, 232 F. Supp. 3d 1243, 1252–53 (S.D. Fla. 2017).

Additionally, under Florida law, "where multiple agreements are entered into by the same parties, at the same time, concerning the same transaction or subject matter, they are generally construed together as a single contract." *Yellow Pages Photos, Inc. v. Ziplocal, LP*, 795 F.3d 1255, 1268 (11th Cir. 2015) (citations omitted).  "Moreover, '[w]here a writing expressly refers to and sufficiently describes another document, the other document, or so much of it as is referred to, is to be interpreted as part of the writing.'" *Pier 1 Cruise Experts v. Revelex Corp.*, 929 F.3d 1334, 1340-41 (11th Cir. 2019) (interpreting contracts negotiated over a period of approximately two years and quoting *Quix Snaxx, Inc. v. Sorensen*, 710 So. 2d 152, 153 (Fla. 3d DCA 1998)); *see also OBS Co. v. Pace Const. Corp.*, 558 So. 2d 404, 406 (Fla. 1990) ("[I]n interpreting the agreement between [the general contractor and the subcontractor], we must examine the effect of the general contract [with the project's owner] and conditions on the otherwise clear and unambiguous risk-shifting provision in the subcontract.").

If a contract is clear and unambiguous, parol evidence is inadmissible to vary or contradict it. *Vencor Hosps. S., Inc. v. Blue Cross & Blue Shield of Rhode Island*, 86 F. Supp. 2d 1155, 1160 (S.D. Fla. 2000), *aff'd sub nom. Vencor Hosps. v. Blue Cross Blue Shield of Rhode Island*, 284

F.3d 1174 (11th Cir. 2002) (citing *J.M. Montgomery Roofing Co. v. Fred Howland, Inc.*, 98 So.2d 484, 485–86 (Fla.1957)).  If a written contract is ambiguous, a court must first determine the character of the ambiguity before deciding whether to admit parol evidence to explain the ambiguity.  *See MDS (Canada) Inc. v. Rad Source Techs., Inc.*, 720 F.3d 833, 844 (11th Cir. 2013), *certified question answered*, 143 So. 3d 881 (Fla. 2014) (citations omitted).  "A patent ambiguity arises from defective, obscure, or insensible language, and Florida law does not permit the introduction of extrinsic evidence to discern the parties' intentions."  *Id.* (citation omitted).  Allowing parol evidence to construe a patent ambiguity would necessarily involve a court impermissibly rewriting the contract.  *Emergency Assocs. of Tampa, P.A. v. Sassano*, 664 So. 2d 1000, 1002 (Fla. 2d DCA 1995).  "A latent ambiguity [exists] where a contract fails to specify the rights or duties of the parties in certain situations and extrinsic evidence is [thus] necessary for interpretation . . .  between two possible meanings."  *MDS (Canada) Inc.*, 720 F.3d at 844 (citation omitted).  When the ambiguity is both latent and patent, Florida courts recognize an "intermediate ambiguity," and "extrinsic evidence is permitted to clarify the parties' intentions."  *Id.*

Plaintiffs allege that Defendant discriminated against the Plaintiff Trusts by granting an Administrative Fee Credit, amounting to a subsidy to reduce servicing costs, to other investors and not the Plaintiff Trusts in contravention of Section 2 of the March 2015 Agreement.  (DE 46 at ¶¶66-68; DE 91 at 15).  Specifically, Plaintiffs argue that they sought contract concessions after Defendant eliminated their ability to receive the Administrative Fee Credit under the Renewal Agreement when Defendant unilaterally negotiated the Renewal Agreement with Litai in November 2014.  (DE 91 at 16).  Therefore, say Plaintiffs, negotiation of the Equal Rights Provision followed, which provides that Defendant "will not grant . . . to any other investors . . . credits (through an Administrative Fee Credit or otherwise) that the Trustee does not grant or offer

to Acheron . . . whether as part of the existing Servicing Agreement, the Renewal Agreement, or through the Trustee's administration of the Trust."  (DE 91 at 16).

According to Plaintiffs, despite the "simple, direct and unambiguous" language in Section 2 stating that Defendant will not grant an Administrative Fee Credit to other investors that it does not grant to Plaintiffs, Defendant gave an Administrative Fee Credit to other investors without giving it to Plaintiffs.  (DE 91 at 16).  Indeed, Plaintiffs' response to Defendant's MSJ centers on their contention that the Court should look no further than the four corners of the March 2015 Agreement and specifically at the language in Section 2 to determine that the parties intended to grant Plaintiffs the Administrative Fee Credit, which the Renewal Agreement had eliminated paying to them.  (DE 91 at 15-20) (citing, among other authority, *Green v. Life & Health of Am.*, 704 So. 2d 1386, 1391 (Fla. 1998) ("We have long held that under contract law principles, contract language that is unambiguous on its face must be given its plain meaning.").

Defendant argues, on the other hand, that the parties intended, and Plaintiffs understood, that Section 2 of the March 2015 Agreement applied to "any *additional* right, disbursement, rebate, benefit, or other distribution of the Overpayment Balance or other consideration not provided in the Renewal Agreement, as approved."  (DE 77 at 13) (emphasis in original).  Defendant contends that Plaintiffs' interpretation of the Equal Rights Provision creates an ambiguity and leads to absurd results because Plaintiffs' interpretation clearly contradicts the plain language in the Renewal Agreement, which the Court approved simultaneous with the March 2015 Agreement, that expressly eliminated payment of the Administrative Fee Credit to Plaintiffs.[18]  (DE 99 at 4).  I agree.

---

[18] Plaintiffs' interpretation creates a latent ambiguity "because the instrument itself [would] not [then] provide sufficient insight into the parties' intent."  *MDS (Canada), Inc. v. Rad Source Techs., Inc.*, 822 F. Supp. 2d 1263, 1297-98 (S.D. Fla. 2011), *aff'd in part, question certified*, 720

Defendant sets forth several meritorious reasons why he is entitled to summary judgment on grounds that the record evidence shows that the parties intended the Equal Rights Provision to apply only to additional rights that Defendant granted after the Renewal Agreement's elimination of the Administrative Fee Credit for Plaintiffs. (DE 77 at 10-15). First, Defendant argues that the parties' intent with respect to Section 2 of the March 2015 Agreement must be consistent with the referenced and contemporaneous Renewal Agreement. (DE 77 at 10-11). There is no dispute that the March 2015 Agreement and the Renewal Agreement were approved simultaneously by the Court. (DE 76 ¶37; DE 92 at¶37). As such, they took effect simultaneously. Therefore, despite Plaintiffs' argument to the contrary (DE 91 at 17), I find that they are contemporaneous agreements that should be construed together. *Ziplocal, LP*, 795 F.3d at 1268; *Pier 1 Cruise Experts*, 929 F.3d at 1340-41.

Furthermore, as Defendant argues, the March 2015 Agreement itself demonstrates the applicability of the terms of the Renewal Agreement by referencing it. (DE 77 at 10-11). Specifically, Section 9 required Defendant to submit a motion to the Court, after both Plaintiffs and Defendant agreed upon the motion's form, to seek Court approval of both agreements:

> Court Approval. This Agreement shall be subject to the approval of the Court. The Trustee shall seek such approval, and approval of the Renewal Agreement, promptly upon the execution of this Agreement by the parties. Within two (2) calendar weeks of the execution of this Agreement, the Trustee shall circulate, to all parties, a draft of the proposed Motion to approve both this Agreement and the Renewal Agreement. *Upon an agreement as to the form of the motion*, the Trustee shall file such motion with the court within fourteen (14) business days and ask for a hearing, if necessary. In the event either this Agreement or the Renewal Agreement is not approved by the Court, Acheron shall be entitled to rescind the purchase of Policy Disposition #39 from the Trust and subsequent purchases

---

F.3d 833 (11th Cir. 2013), *certified question answered*, 143 So. 3d 881 (Fla. 2014), *and aff'd*, 579 F. App'x 700 (11th Cir. 2014). However, I do not address Defendant's argument as to what parol evidence shows because the parties dispute the meaning of such evidence, and I find the record sufficient to construe the parties intent with respect to Section 2 without resorting to Defendant's parol evidence.

through the date the Court takes action not to approve this Agreement and/or the Renewal Agreement. This paragraph shall survive and be enforceable, even if the Court does not approve this Agreement or the Renewal Agreement.

(DE 76-33 at § 9) (emphasis added).

Additionally, it is undisputed that Plaintiffs approved a draft motion, which was substantially equivalent in form and content to the actual motion ("Approval Motion"), seeking simultaneous approval of both the March 2015 Agreement and the Renewal Agreement. (DE 76-35; DE 76 at ¶34; DE 92 at ¶34; SEC DE 2500). The Approval Motion specifically and expressly advised the Court about significant changes that the Renewal Agreement made to the Servicing Agreement, including that the Administrative Fee Credit would no longer be payable to Plaintiffs under the terms of the Renewal Agreement. (SEC DE 2500 at 6). The Approval Motion also advised the Court about the significant terms of the March 2015 Agreement, which included that "[t]he Trustee will not grant any rights, benefits or credits to other investors in Keep Policies that are not extended to Acheron on the same terms." (SEC DE 2500 at 9).

Construing the agreements together, Defendant's interpretation harmonizes the agreements whereas Plaintiffs' interpretation does not.[19] *See Triple E Dev. Co.*, 51 So. 2d at 438–39. Indeed, Plaintiffs' interpretation would invalidate the provision in the Renewal Agreement that eliminated payment to them of the Administrative Fee Credit (while contradicting their own non-opposition

---

[19] Plaintiffs argue that "the March 2015 Agreement states that the Trustee may *no longer* discriminate generally, and *specifically with respect to the [Administrative Fee] Credit*, between Acheron and other investors '*under the Renewal Agreement*.'" (DE 91 at 17) (emphasis added). Plaintiffs, in essence, are arguing that the March 2015 Agreement removed the provision in the Renewal Agreement, which was highlighted in the Approval Motion, eliminating payment of the Administrative Fee Credit to Plaintiffs. The March 2015 Agreement, however, did not purport to modify the Renewal Agreement nor do Plaintiffs expressly allege that the March 2015 Agreement modified the Renewal Agreement. Therefore, I find Plaintiffs' argument that "the reference in the March 2015 Agreement to the Renewal Agreement proves the opposite of what the Trustee believes it demonstrates" to lack merit. *Id.*

46

to a motion that specifically highlighted this elimination).  *See Hunt*, 381 So. 2d at 1197.

Accordingly, I find Defendant's argument meritorious that the parties intended the Equal Rights

Provision to apply to additional rights that were not the subject of the Renewal Agreement.

The Approval Motion's assurance to the Court that no conflict existed between the two

agreements provides further support for Defendant's interpretation of Section 2.  After detailing

the significant provisions of the March 2015 Agreement, the Approval Motion stated: "the Trustee

does not believe that any of the terms of the [March 2015] Agreement are in any way *inconsistent*

*with the . . . Servicing Agreement, as amended*."  (SEC DE 2500 at 11) (emphasis added).

Notably, the assurance given compared the March 2015 Agreement *with* the Servicing

Agreement, as amended, or, in effect, the Renewal Agreement.  The assurance given did not

compare the Renewal Agreement *with the March 2015 Agreement*.  Nor did the assurance given

state that the agreements lacked inconsistency *with one another*.  In other words, the Trustee's

averment to the Court, which Plaintiffs approved, held up the Renewal Agreement as the standard

against which to evaluate the March 2015 agreement – and not the other way around.  Thus, the

Approval Motion, in effect, affirmed that the terms of the Renewal Agreement, particularly the

provision eliminating the Administrative Fee Credit to Plaintiffs that the Approval Motion

expressly detailed, remained in full force and effect.

Again, it is undisputed that Plaintiffs approved the language of the Approval Motion.  Thus,

Plaintiffs became part of a collective effort, with Defendant, to advise the Court, in essence, that

the terms of the March 2015 Agreement were consistent with the Servicing Agreement, as

amended by the Renewal Agreement.  In effect, therefore, Plaintiffs stipulated that the terms of

the March 2015 Agreement were consistent *with* the Renewal Agreement.  The Equal Rights

Provision cannot be consistent with the Renewal Agreement, however, unless Defendant's

contention is true: "Section 2 was understood and intended to apply to any *additional* right . . . not provided for in the Renewal Agreement, as approved."  (DE 77 at 13) (emphasis in original).

Given the above facts, I conclude that the parties intended that Plaintiffs would not receive the Administrative Fee Credit under the terms of the Renewal Agreement, and Defendant's non-payment of the Administrative Fee Credit to Plaintiffs pursuant to the Renewal Agreement does not violate Section 2 of the March 2015 Agreement.  Indeed, I conclude that such non-payment of the Administrative Fee Credit to Plaintiffs under the terms of the Renewal Agreement is consistent with how the parties intended Section 2 to apply, which application the Court approved at the parties' prompting.

Second, Defendant argues, partly in a footnote, that *res judicata* applies.[20]  (DE 77 at n.11, 14).  When addressing Defendant's motion to dismiss the second amended complaint, the District Court expressly stated that, "[t]o the extent there is an ambiguity for the Court to resolve [with respect to the March 2015 Agreement], the Court can revisit the issue at summary judgment, as well as the *res judicata* argument."  (DE 45 at 10).  Specifically, the District Court "ha[d] concerns about applying *res judicata* principles to this claim based on Acheron's failure to object in Court to an agreement already entered by two other parties" (Defendant and Litai) and noted that Plaintiffs could still state a claim based on Defendant's prospective conduct.[21]  (DE 45 at 9-10).  Defendant now moves for the Court to reconsider the issue of *res judicata*.  (DE 77 at n.11, 14).

---

[20]  Defendant argues in the body of his MSJ preceding the subject footnote that Plaintiffs "concocted [their entitlement to the fee credit] entirely for litigation[, which] is manifestly inconsistent with the parties' expressed intent and conduct recognizing that Plaintiffs would not receive an Administrative Fee Credit under the Renewal Agreement."  (DE 77 at 10).

[21]  Defendant argues that the operative complaint "is not based on any 'prospective behavior' other than the parties acting in conformity with their clear understanding that Acheron would not receive any Administrative Fee Credit under the Renewal Agreement."  (DE 77 at n.11).  I agree that

As the District Court stated, "[*r*]*es judicata* applies to all matters that were raised, or that could have been raised in a prior proceeding." (DE 45 at 9) (citing *Agripost, Inc. v. Miami-Dade Cnty.*, 195 F.3d 1225, 1232 (11th Cir. 1999)). *See also Seaboard Coast Line R. Co. v. Indus. Contracting Co.*, 260 So. 2d 860, 863 (Fla. 4th DCA 1972) ("[U]nder res adjudicata a final decree or judgment Bars a subsequent suit between the same parties based upon the same cause of action and is conclusive as to all matters germane thereto that were or could have been raised."). "A consent judgment is a judicially approved contract, rather than a judgment entered after litigation, but it is a judgment nonetheless and entitled to the same preclusive, res judicata effect as any other judgment issued by a Florida court." *Gallagher v. Dupont*, 918 So.2d 342, 347 (Fla. 5th DCA 2005) (citing *Arrieta–Gimenez v. Arrieta–Negron*, 551 So.2d 1184, 1186 (Fla.1989)). Black's Law Dictionary defines an agreed judgment as "[a] settlement that becomes a court judgment when the judge sanctions it. • In effect, an agreed judgment is merely a contract acknowledged in open court and ordered to be recorded, but it binds the parties as fully as other judgments. – Also termed *consent judgment; stipulated judgment; judgment by consent*." Black's Law Dictionary (10th ed. 2014) (emphasis in original).

Here, the facts show that the March 2015 Agreement was, in effect, an agreed judgment, which referenced and incorporated the Approval Motion and the Renewal Agreement. Plaintiffs concede that the March 2015 Agreement settled their dispute about the Renewal Agreements' elimination of the Administrative Fee Credit.[22] (DE 91 at 16). As previously discussed, Plaintiffs

---

Plaintiffs' allegations focus on Plaintiffs' right to the Administrative Fee Credit that the Renewal Agreement eliminated paying to them.

[22] Plaintiffs' response to Defendant's MSJ states the following:

> [T]he Trustee revised the contract language relating to the [Administrative Fee] Credit so that the Renewal Agreement stated that the credit was given, 'only with

insisted upon, via Section 9 of the March 2015 Agreement, the Court's simultaneous approval of the March 2015 Agreement and the Renewal Agreement through a motion, which motion they approved.   Thus, as Defendant correctly argues, the undisputed facts show that "Acheron affirmatively supported approval of the Renewal Agreement without modification."  (DE 77 at n.11).  Therefore, I conclude that Plaintiffs agreed to the Renewal Agreement's elimination of the Administrative Fee Credit with respect to them.

Moreover, Plaintiffs fail to even argue, and certainly introduce no evidence to indicate, that *res judicata* should not apply.  In fact, Plaintiffs fail to offer any rationale for why they did not object to - and, in fact, supported - the Approval Motion, which communicated to the Court that the terms of the March 2015 Agreement did not conflict with the Renewal Agreement.  Rather, as noted previously, Plaintiffs merely argue that the plain language of the Equal Rights Provision is "simple, direct and unambiguous" and "must be enforced as written."  (DE 91 at 16).

 Accordingly, I find that *res judicata* principles should apply here to support granting summary judgment in favor of Defendant on the issue of the Administrative Fee Credit.  First, Plaintiffs offer no response to Defendant's argument regarding *res judicata* in violation of the local rules.  *See* S.D. Fla. L.R. 7.1(c)(1) ("[E]ach party opposing a motion shall file and serve an opposing memorandum of law no later than fourteen (14) days after service of the motion. Failure to do so may be deemed sufficient cause for granting the motion by default.").  Second, the March

---

respect to those Keep Policy Investment Interests held by a person or entity who had acquired such interest prior to the entry of the Receivership Order. . ..

Acheron protested the elimination of the Credit. . .. The Trustee acknowledges Acheron objected because it wanted the same credit as the other (the Keep Policy) investors. . .. The result was much negotiating with Acheron seeking contract concessions by the Trustee in the March 2015 Agreement.

(DE 91 at 15-16).

2015 Agreement was, in effect, a settlement of the dispute between Plaintiffs and Defendant as to various matters addressed by the agreement, including the issue of the Administrative Fee Credit. It is undisputed that Plaintiffs approved the motion that the Trustee made to obtain Court approval of the March 2015 Agreement and Renewal Agreement.  While not formally presented as a motion for a stipulated order, Plaintiffs' approval of the Approval Motion gave it Plaintiffs' imprimatur such that it had the effect of a stipulation. *Woodman Pebbling Mach. Co. v. Guild*, 154 U.S. 597, 597 (1874) (reversing a judgment or decree and entering decree by consent "as appears by the stipulation, which should be recorded in the case").  The District Court then entered its Order granting the Approval Motion consistent with the parties' request and pursuant to the parties' agreed motion and the motion's averment that the terms of the March 2015 Agreement did not conflict with the Renewal Agreement.  As previously discussed, Plaintiffs made themselves part of that averment by approving the draft of the Approval Motion and by not otherwise objecting to the Approval Motion when made.  Therefore, I find that it is proper for *res judicata* principles to apply to bar the Plaintiffs from now asserting a claim that puts the March 2015 Agreement in conflict with the Renewal Agreement.

Third, Defendant argues that, to the extent that there is any ambiguity, the parties' subsequent conduct is evidence of their intent.  (DE 77 at 11-14).  "Where an agreement is ambiguous, the meaning of the agreement may be ascertained by looking to the interpretation that the parties have given the agreement and the parties' conduct throughout their course of dealings." *Rafael J. Roca, P.A. v. Lytal & Reiter, Clark, Roca, Fountain & Williams*, 856 So. 2d 1, 5 (Fla. 4th DCA 2003).  Indeed, "the interpretation the parties give to a contract may be the best indication of their intentions."  *Mayflower Corp. v. Davis*, 655 So. 2d 1134, 1137 (Fla. 1st DCA 1994). Furthermore, "[c]ourse of performance is not parol evidence because although extrinsic to the

contract it identifies the parties' post-agreement conduct rather than their actions prior or contemporaneous to contract formation." *Hirsch*, 232 F. Supp. 3d at 1253 (internal quotation marks and citations omitted).

Here, Defendant is due summary judgment on the Administrative Fee Credit issue on grounds that that Plaintiffs' conduct after approval of the March 2015 Agreement indicates that the parties intended Section 2 to give effect to the Renewal Agreement's elimination of the Administrative Fee Credit with respect to them.  First, it is undisputed that Plaintiffs paid the full amount of administrative fees for *years* without demanding the Administrative Fee Credit that the Renewal Agreement eliminated.  (DE 76 at ¶38-40; DE 92 at ¶38-40).  In particular, Plaintiffs agreed that, "[f]or years after the Order on the Approval Motion, Acheron Capital received monthly spreadsheets from Litai indicating, on a per policy interest basis, that no Plaintiff was receiving an Administrative Fee Credit after the Renewal Agreement was implemented," and Acheron Capital's own COO reviewed such spreadsheets."  (DE 76 at ¶39; DE 92 at ¶39).  Plaintiffs also unquestionably agree that they received the spreadsheets for years *without once* questioning why they were not receiving an Administrative Fee Credit.  (DE 76 at ¶40; DE 92 at ¶40).  As such, I find that Plaintiffs' own conduct should be construed to mean that the parties intended that March 2015 Agreement to acknowledge the Renewal Agreement's terms and intended Section 2 to apply to new benefits that were not the subject of the Renewal Agreement. *See Rafael J. Roca, P.A.,* 856 So. 2d at 5.

Moreover, once again, Plaintiffs do not address Defendant's argument – here, regarding course of performance.  *See* S.D. Fla. L.R. 7.1(c)(1) ("[E]ach party opposing a motion shall file and serve an opposing memorandum of law no later than fourteen (14) days after service of the motion. Failure to do so may be deemed sufficient cause for granting the motion by default.").

Plaintiffs acknowledge that they delayed "asserting [their] rights" in arguing that such delay did not constitute waiver (DE 91 at 20)[23]; however, Plaintiffs fail to address why their voluntary and knowing payment of the full administrative fee for *years* should not be construed to indicate that the parties intended Section 2 to be consistent with the Renewal Agreement's elimination of the Administrative Fee Credit with respect to Plaintiffs.  Thus, I find that Defendant is also entitled to summary judgment on these grounds by default.

In sum, I find that the parties intended for the March 2015 Agreement to recognize that Plaintiffs would no longer receive the subject Administrative Fee Credit.  First, reading the March 2015 Agreement together with the contemporaneous and referenced Renewal Agreement indicates recognition of the Renewal Agreement's elimination of the Administrative Fee Credit.  Second, principles of *res judicata* should apply because Plaintiffs were active participants in seeking the Court's simultaneous approval of the March 2015 Agreement and the Renewal Agreement and in averring that the March 2015 Agreement was not inconsistent with the unmodified Renewal Agreement.  Third, to the extent that an ambiguity exists, Plaintiffs' payment of the full administrative fee without objection for years following the Court's simultaneous approval of the March 2015 Agreement and the Renewal Agreement indicates recognition on their part that

---

[23] I do not find waiver to constitute grounds for a grant of summary judgment in favor of Defendant. (DE 77 at 14-15; DE 99 at 7).  As Plaintiffs argue, the March 2015 Agreement includes an anti-waiver clause, which Florida courts consistently enforce.  (DE 91 at 19-20; DE 46-3 at §19) (citing, among other authority, *Nat'l Home Comtys. L.L.C. v Friends of Sunshine Key, Inc.*, 874 So. 2d 631, 634 (Fla. 3d DCA 2004)).  Furthermore, under Florida law, the question of waiver is an issue of fact.  (DE 91 at 20) (citing, among other authority, *QBE Ins. Corp. v. Dome Condo. Ass'n, Inc.*, No. 08-20906-CIV, 2009 WL 10668915, at *4 (S.D. Fla. June 2, 2009)).  Here, while Plaintiffs' conduct in forbearing the enforcement of a claimed right and in approving the motion seeking simultaneous approval of the March 2015 Agreement and the Renewal Agreement indicates a possibility of waiver, I do not find it to "make out a clear case of waiver."  *QBE Ins. Corp.*, 2009 WL 10668915 at *4.  Rather, I find that the conduct creates genuine issues of material fact as to whether Plaintiffs waived their right to the Administrative Fee Credit as Defendant argues in the alternative that they did.

Section 2 of the March 2015 Agreement applied to new benefits and not to the Administrative Fee Credit that the Renewal Agreement eliminated.  Therefore, I conclude Defendant is entitled to summary judgment as to Plaintiffs' claim for breach of Section 2 for failure to pay Plaintiffs the Administrative Fee Credit.

### D.  Whether the Fiduciary Duty Claims Fail (Counts 2 and 3)

I find that the Court should grant summary judgment in favor of Defendant as to Plaintiffs' fiduciary duty tort claims - Count 2 (Breach of Fiduciary Duty) and Count 3 (Breach of Implied Fiduciary Duty).  In the Third Amended Complaint, Plaintiffs alleged that Defendant breached the fiduciary duty that he owed to Plaintiffs as Keep Policy Investors (i) by granting an Administrative Fee Credit to other Keep Policy Investors, but not to Plaintiffs, and by granting to other Keep Policy Investors a more favorable Administrative Fee Credit than Defendant granted to Plaintiffs ("Administrative Fee Credit Claims") (DE 46 at ¶¶75, 80); (ii) by delaying the sale of interests in Keep Policies to Plaintiffs ("Delay in Sale Claims")[24] (DE 46 at ¶¶81-83); and (iii) by failing to

---

[24] Although Plaintiffs reserved their rights with respect to the Court's ruling on the Delay in Sale Claims, Defendant sought and received clarification from the Court in the Receivership Action on at least some issues relating to the Delay in Sale Claims.  *See* SEC DE 2574.  During the hearing to address Defendant's request for clarification, Defendant reported to the Court that "the [T]rust is not in the business of selling matured policies, period."  (SEC DE 2574 at 78:24-25).  In response to the Court's inquiry regarding what argument Plaintiffs had to support a claim to proceeds for the purchase of a matured policy, Plaintiffs' Counsel stated: "We would love to buy them.  I'm not going to kid you.  We would be delighted to buy matured policies, but we're not in the possession of that knowledge.  I think the fairest thing to do in that circumstance is to distribute that [ratably] among the investors, which may or may not include Acheron, who have not defaulted on the policy."  (SEC DE 2574 at 80:6-20).  Defendant responded that "[f]rom the [T]rust's perspective, there is a keep policy investor who since sometime prior to 2004 had owned an interest in this policy and for a period of more than nearly ten years has been paying to maintain that policy even if they didn't make this most recent payment."  Defendant also reported having a continuing fiduciary duty to a defaulting Victim Investor.  (SEC DE 2574 at 83:2-86:3).  The Court ruled for Defendant and agreed that proceeds of the matured policy should go to the previous, defaulting investor with the premium payment coming out that investor's death benefit.  (SEC DE 2574 at 6:9-16).  The position taken by the Court in the Receivership Action on these issues is consistent

provide reporting and communications to Plaintiffs ("Reporting Claims") (DE 46 at ¶¶84-98).[25] Plaintiffs further alleged that, even if not a Keep Policy Investor as defined under the Trust Agreement, Defendant owes Plaintiffs implied fiduciary duties because Defendant retains control over Keep Policies in which Plaintiffs own a majority of the investment interests and/or Plaintiffs are the successor to the defaulting investors to whom Defendant owed fiduciary duties under the Trust Agreement.  (DE 46 at ¶103).  Plaintiffs re-alleged the Administrative Fee Credit Claims, the Delay in Sale Claims, and the Reporting Claims under a theory of implied fiduciary duty. (DE 46 at ¶¶107-124).

"[T]to establish a breach of fiduciary duty under Florida law, a plaintiff must prove three elements: the existence of a fiduciary duty, a breach of that duty, and that the plaintiff's damages were proximately caused by the breach."  *Med. & Chiropractic Clinic, Inc. v. Oppenheim*, 981 F.3d 983, 989–90 (11th Cir. 2020) (citing *Gracey v. Eaker*, 837 So.2d 348, 353 (Fla. 2002)). "'Where a breach of fiduciary duty is shown but no actual damages are proved, nominal damages may be awarded.'"  *Highsmith v. ECAA, LLC*, 138 So. 3d 544, 544 (Fla. 1st DCA 2014) (quoting *Minotty v. Baudo*, 42 So.3d 824, 836 (Fla. 4th DCA 2010)).   "A fiduciary relationship [in Florida] may be either express or implied."  *Maxwell v. First United Bank*, 782 So. 2d 931, 933 (Fla. 4th DCA 2001).  Express fiduciary relationships are created "by contract, such as principal/agent or attorney/client, or through legal proceedings, such as trustee/beneficiary and guardian/ward." *Cap. Bank v. MVB, Inc.*, 644 So. 2d 515, 518 (Fla. 3d DCA 1994).  "Fiduciary relationships implied in

---

with recognizing Victim Investors' status as beneficiaries of the Trust as opposed to recognizing Plaintiffs – as third-party purchasers of defaulting interests – as being beneficiaries of the Trust.

[25] In its Order Granting in Part and Denying in Part Motion to Dismiss the Second Amended Complaint, the District Court determined that Plaintiffs could proceed on their breach of fiduciary duty claims with respect to: (i) the Administrative Fee Credit; (ii) the delays in offering defaulting interests in the policies to Plaintiffs; and (iii) failing to provide reporting and communications to Plaintiffs.   (DE 45 at 13-16).

law are premised upon the specific factual situation surrounding the transaction and the relationship of the parties. Courts have found a fiduciary relation implied in law when confidence is reposed by one party and a trust accepted by the other." *Id.* (internal quotation marks and citation omitted).

The District Court previously determined that Plaintiffs' claims for breach of fiduciary duty are contingent on findings that Plaintiffs are Keep Policy Investors[26] and on findings that Defendant owes Plaintiffs a fiduciary duty. (DE 45 at 13). Therefore, I analyze whether Plaintiffs are Keep Policy Investors, who are owed a fiduciary duty, under the Trust Agreement or under any other theories argued by Plaintiffs before turning to Plaintiffs' claims under a theory of implied fiduciary duty.[27]

### 1. Plaintiffs are Not Keep Policy Investors as Defined By the Trust Agreement

I find that Plaintiffs are not Keep Policy Investors for the reasons stated below. As the District Court observed, Plaintiffs contend that they are Keep Policy Investors whereas Defendant argues that they are not. (DE 76 at 16; DE 91 at 7; DE 45 at 13). The District Court found the

---

[26] As previously noted, Plaintiffs have filed a cross-motion for summary judgment with respect to the issue of their status as Keep Policy Investors. (DE 75).

[27] Defendant argues that no fiduciary duty is owed to Plaintiffs (express or implied) because (i) Plaintiffs are not Keep Policy Investors; (ii) Plaintiff Acheron Capital's relationship with Defendant is purely contractual; (iii) many of Plaintiffs' fiduciary duty claims have been mooted; (iv) Plaintiffs cannot elevate arms-length contractual purchases to a fiduciary relationship; (v) Plaintiffs' fiduciary duty claims mimic their contract claims and should, therefore, be dismissed; and (vi) no implied fiduciary duty exists due to Defendant disclaiming any fiduciary relationship when the March 2015 Agreement was executed. (DE 77 at 15-20). The District Court allowed Plaintiffs fiduciary duty claims to move forward finding that whether Plaintiffs were Keep Policy Investors and owed a fiduciary duty were determinative as to these claims. Therefore, I focus the analysis on these issues and consider Defendant's arguments in the context of Plaintiffs' contentions that they are owed a fiduciary duty whether by virtue of being a Keep Policy Investor or otherwise.

definition of Keep Policy Investor in the Trust Agreement to be ambiguous and deferred until summary judgment the issue of whether Plaintiffs are intended to be included in the scope of the definition.  (DE 45 at 13) (stating that "the Court determined that the definition of a Keep Policy Investor was ambiguous and that the Court would determine at summary judgment whether the parties intended to include Acheron in the scope of the definition").

The settlor's intent is the polestar of trust interpretation.  *Horgan v. Cosden*, 249 So. 3d 683, 686 (Fla. 2d DCA 2018).  "A trustee is generally obligated to follow the settlor's true intent and purposes in discharging his/her duties in managing the trust."  *Reid v. Temple Judea*, 994 So. 2d 1146, 1148 (Fla. 3d DCA 2008).  In determining the settlor's intent, courts should construe the instrument as a whole.  *Roberts v. Sarros*, 920 So. 2d 193, 195 (Fla. 2d DCA 2006).  "Furthermore, 'no word or part of an agreement is to be treated as a redundancy or surplusage if any meaning, reasonable and consistent with other parts, can be given to it.'"  *Littell v. L. Firm of Trinkle, Moody, Swanson, Byrd & Colton,* 345 F. App'x 415, 420 (11th Cir. 2009) (quoting *Sarros*, 920 So.2d at 196).  "Extrinsic evidence should be considered only if the language used in the document is ambiguous."  *Ludwig v. AmSouth Bank of Fla.*, 686 So. 2d 1373, 1376 (Fla. 2d DCA 1997).

The Trust Agreement defines "Keep Policy Investor" as "persons who have invested in an entire interest or a fractional interest in a Keep Policy *owned of record by the Receivership Entities*," and whose interest in such Keep Policy has not been forfeited as of the Closing Date."[28] (DE 76-20 at Art. 1, § 1.1) (emphasis added).  Defendant argues that the language means that "Plaintiffs [must] show that they acquired their interest from the 'Receivership Entities'" such that

---

[28] The Trust Agreement defines "Receivership Entities" as Mutual Benefits Corp., Viatical Services, Inc., and Viatical Benefactors, LLC. *Id.* As Plaintiffs explain, the "Closing Date" is the date of the sale of the servicing assets under the Litai APA in 2009, which was part of the Court-approved transaction whereby the Trust was created.  (DE 91 at 8).

the definition's language reads more precisely "owned of record [at the time of investment] by the Receivership Entities." (DE 77 at 17). Plaintiffs, on the other hand, contend that the Trust Agreement *unambiguously* bestows upon them Keep Policy Investor status. (DE 91 at 7-10). Plaintiffs also argue that, to the extent the Court retains the view that the definition of Keep Policy Investors is ambiguous, parol evidence in the form of the Servicing Agreement supports resolving that ambiguity in Plaintiffs' favor. (DE 91 at 10-11).

As to Plaintiffs' first argument – that the definition of Keep Policy Investor unambiguously bestows upon them their status as such – I find that Plaintiffs are incorrect. Plaintiffs argue that no ambiguity exists because: (i) Plaintiffs acquired entire and fractional interests in Keep Policies from the Receiver, which were transferred by the Receiver to the Trust; (ii) the interests had not been forfeited as of the Closing Date; and (iii) the policies in which Plaintiffs have an interest were at one time "owned of record by the Receivership Entities." (DE 91 at 7-8). Plaintiffs argue that the "owned of record" language in the definition does not have a temporal limitation such that the Receivership Entities had to own the interests at the time of the investment. (DE 91 at 8). In other words, because Plaintiffs made their purchases from the Receiver prior to the "Closing Date," which was contemporaneous with the formation of the Trust, Plaintiffs argue that they are Keep Policy Investors.[29] (DE 91 at 8). Plaintiffs further argue that, to import a temporal limitation – interests owned of record [at the time of investment] by the Receivership Entities – impermissibly

---

[29] The mere fact that Plaintiffs purchased interests from the Receiver prior to the Closing Date does not confer upon them Keep Policy Investor status. Regardless of whether they purchased interests prior to the Closing Date, they must still satisfy the "owned of record" portion of the definition of Keep Policy Investor. As the District Court stated, the Trust Agreement does not specify a date on which the policy "must be owned of record" by the Receivership Entities and deferred the issue regarding the parties' intent *with respect to the "owned of record" language* to summary judgment. (DE 24 at 11-12).

rewrites the contract.  (DE 91 at 8).  Plaintiffs' argument is unavailing because Plaintiffs' definition renders the words "owned of record by the Receivership Entities" unnecessary.

As the District Court explained in its First Dismissal Order, fundamental principles of contract interpretation preclude the Court from accepting an interpretation that renders useless the language "owned of record by the Receivership Entities."  (DE 24 at 11) (citing *Panama Music, Corp. v. Universal Music Group, Inc.*, No. 12-20200, 2013 WL 1230734, at *7 (S.D. Fla. July 9, 2013)).  Thus, the District Court rejected in its First Dismissal Order Plaintiffs' interpretation that the definition of Keep Policy Investor unambiguously intended "to include all holders of fractional interests in Keep Policies (including Acheron)" because the "owned of record" language would be mere surplusage.  *Id.*

Plaintiffs now proffer that the "owned of record" language merely qualifies the source of the interests purchased – interests owned of record [at one time] by the Receivership Entities – and does not mean that a purchaser had to purchase directly from the Receivership Entities.  (DE 91 at 8).  However, Plaintiffs' interpretation still makes the words "owned of record by the Receivership Entities" unnecessary because "all the fractional interests were originally owned by the Receivership entities."  (DE 24 at 12).  Stating that the subject interests were "owned of record [at one time] by the Receivership entities" contributes nothing to the definition because it does not distinguish between any of the interests in Keep Policies that had not been forfeited by the Closing Date.   By contrast, Defendant's interpretation gives meaning to the words "owned of record by the Receivership Entities," rather than rendering them superfluous, because the words distinguish between investors who purchased their interests pre-receivership and investors who purchased their interests post-receivership.  Thus, I find that Plaintiffs' argument that they are Keep Policy Investors by the unambiguous plain language of the definition in the Trust Agreement fails.

The District Court found the definition ambiguous and stated that it would "defer this issue to summary judgment on a complete record of the parties' intent because it is true that the definition [of Keep Policy Agreement in the Trust Agreement] excludes a date and all the fractional interests were originally owned by the Receivership entities." (DE 24 at 12).  Given the District Court's finding of ambiguity, I look to the undisputed facts and certain undisputed extrinsic evidence to determine whether the Trust Agreement's definition intended to include Plaintiffs.

First, it is undisputed that "[t]he Receiver created the Trust to preserve the Keep Policies for the benefit of victim investors who elected to become Keep Policy Investors."  (DE76 at ¶9; DE 92 at ¶9).  Second, extrinsic evidence, ascertainable by review of the record in the Receivership Case, demonstrates that the Receiver, as settlor, intended to only benefit and protect the victim investors through forming the Trust.  The evidence makes clear that the Receiver intended the definition of Keep Policy Investor to mean those investors who purchased interests "owned of record [at the time of investment] by the Receivership Entities"; in other words, the Receiver intended that a Keep Policy Investor was a victim who purchased their interest directly from the Receivership Entities.  For example, in a hearing on July 22, 2009, the Receiver stated to the District Court: "[W]e're trying to bring finality to the receivership and to the Court's involvement over this aspect of the operation in a way that treats the Keep Investors as fairly as possible in light of the fact *they were victimized early on*."  (SEC DE 2310 at 19:13-16) (emphasis added).  Following that hearing, on July 28, 2009, the Receiver filed a notice wherein he explained the transactions that would include creation of the Trust.  (SEC DE 2315).  In explaining the purpose of the Trust structure, the Receiver stated:

> "The Trustee will have the responsibility . . . to review and supervise . . . performance . . . under the Servicing Agreement . . . something that several thousand individual investors would have difficulty doing on their own. Particularly *given* the affiliation between both [the potential acquirer of the

servicing business] and potential policy purchasers and the potential for *at least perceived conflicts of interest, the Receiver believed such a structure was appropriate and in the interests of the Keep Policy investors*."

(SEC DE 2315 at 4-5) (emphasis added). Here, in discussing how the Trust structure will protect Keep Policy investors, the Receiver delineated between those investors and "potential policy purchasers," who could have affiliations with the servicing entity, leading to conflicts of interest. This distinction further evinces an intent by the Receiver to limit the definition of Keep Policy Investors to Victim Investors and exclude subsequent purchasers.

The Receiver's concern for the Victim Investors is also a natural and unremarkable consequence of the performance of his duties for the Court.[30]   Receivership property "is a fund in court" that is "to be applied to the payment of the judgment creditor who has filed his [claim]." *Barton v. Barbour*, 104 U.S. 126, 129 (1881). Indeed, courts have acknowledged that bankruptcy trustees and equity receivers alike are appointed to oversee a debtor's estate and carry out the court's duty "'to distribute . . . assets to creditors equitably and according to their respective priorities.'" *In re VistaCare Grp., LLC*, 678 F.3d 218, 225 (3d Cir. 2012) (quoting *Barton*, 104 U.S. at 136). "In simple terms, the Receiver takes actions for the benefit of innocent investors who were victimized by [a] fraudulent scheme . . .." *Sec. & Exch. Comm'n v. Lauer*, No. 03-80612-CIV, 2015 WL 11004892, at *6 (S.D. Fla. Nov. 24, 2015).

Therefore, I conclude that the Receiver did not intend to include investors outside of Victim Investors in the definition of Keep Policy Investors. As further support for the Receiver's intent to only benefit Victim Investors, the Trustee testified that he understood that Keep Policy Investors were victims of the MBC scheme who purchased interests from the Receivership Entities. (DE 76

---

[30] Plaintiff in the Receivership Action, the Securities and Exchange Commission ("SEC"), moved the Court "for an Order appointing a Receiver . . . [to] take whatever actions are necessary for the protection of the investors." (DE 5). The District Court granted the SEC's motion. (SEC DE 26).

at ¶12; DE 92 at ¶12).  *See Reid*, 994 So. 2d at 1148 (stating that a trustee must follow a settlor's true intent; therefore, a trustee must know the settlor's intent).  Thus, I find that the record evidence indicates that the purpose of the Trust was to protect only the victims of the original fraud.

By contrast, Plaintiffs do not point to any parol evidence demonstrating that the settlor intended for the definition of Keep Policy Investor to include them.  Contrary to Plaintiffs' argument, the Servicing Agreement is not parol or extrinsic evidence showing a course of performance that supports deeming Plaintiffs to be Keep Policy Investors.  *See* (DE 91 at 10) (citing *Maines v. Davis*, 491 So. 2d 1233, 1235 (Fla. 1st DCA 1986) ("[T]he conduct of the parties through their course of dealings shall be considered to determine the meaning of the written agreement where the terms are in doubt.")).  Plaintiffs argue that they received the Administrative Fee Credit pursuant to the Servicing Agreement for five years prior to Defendant's unilateral termination following expiration of the Servicing Agreement.  (DE 91 at 10-11).  Plaintiffs also contend that the Servicing Agreement was structured such that all investors in Keep Policies were intended as Keep Policy Investors.  (DE 91 at 11).  In support of their contention, Plaintiffs argue that the servicer treated Plaintiffs as Keep Policy Investors.  (DE 91 at 11).

I agree with Defendant that the parol or extrinsic evidence to which Plaintiffs point reflects only that the Trust elected to pay an Administrative Fee Credit until commencing negotiations of the Renewal Agreement, and the servicer was not directed to service the interests that Plaintiffs purchased any differently than other investors.  (DE 99 at 8).  Also, Defendant correctly argues that the Servicing Agreement and the Trust Agreement's definition of Keep Policy Investor were structured the same as "persons who have invested in an entire interest or a fractional interest in a

Keep Policy owned of record by the Receivership Entities."[31]  (DE 99 at 9).  Furthermore, the fact that the servicer may have provided the same services to Plaintiffs as to other investors does not confer Keep Policy Investor status upon Plaintiffs.  Nor does the servicer's belief or intentions with respect to Plaintiffs' investment interests illuminate the issue because, as Defendant correctly notes, the servicer is not a party to the Trust Agreement and is not a party to any agreement between the Trust and Plaintiffs.  (DE 99 at 9).  Indeed, contrary to what Plaintiffs argue regarding the servicer, it is undisputed that the Trustee understood that the purpose of the Trust was to maintain and preserve the Keep Policies for the benefit of Victim Investors and that he is fiduciary to the Victim Investors who continue to hold interests in Keep Policies.  (DE 76 at ¶13; DE 92 at ¶13).

Plaintiffs also argue that, just like successors pursuant to Section 7.1 of the Servicing Agreement (providing for successors on the basis of IRA distributions, investor deaths, and divorces), Plaintiffs qualify as successors to Keep Policy Investors who defaulted in paying premiums and should be treated as Keep Policy Investors.  (DE 91 at 11).  But Plaintiffs' argument about the Servicing Agreement providing for successors in Section 7 actually cuts against their argument that the Servicing Agreement recognized Plaintiffs as Keep Policy Investors because, by limiting changes in investors to such events as deaths or divorces, the Servicing Agreement provisions lacked accommodation for the transfer of a Keep Policy Investor's interest to a third-party purchaser.  As Defendant argues, forfeited interests revert back to the Trust, are owned by the Trust, and the Trust then offers for sale such interests in a policy.  (DE 99 at 10).  As such, Plaintiffs are *not* successors to Keep Policy Investors' forfeited interests in the same manner as the

---

[31] Plaintiffs note that the Keep Policy Investor definition utilized by the Servicing Agreement dropped the phrase "whose interest has not been forfeited as of the Closing Date."  (DE 91 at n.2).

Servicing Agreement provides for successors on the basis of IRA distributions, investor deaths, and divorces.

Defendant's interpretation of the definition of Keep Policy Investor – that "owned of record by the Receivership Entities" means "owned of record [at the time of investment] by the Receivership Entities" – is both consistent with finding that the Receiver's intent in forming the Trust was to protect only the Victim Investors and gives meaning to all the words in the definition. Therefore, any ambiguity in the definition of Keep Policy Investor should be resolved in favor of Defendant's interpretation and against Plaintiffs'.

In sum, Plaintiffs are not Victim Investors.  Indeed, it is undisputed that Plaintiffs did not acquire their interests from a Receivership Entity.  (DE 76 at ¶21; DE 92 at ¶21).  Thus, I conclude that Plaintiffs are not "persons who have invested in an entire interest or a fractional interest in a Keep Policy owned of record by the Receivership Entities" and do not meet the definition of a Keep Policy Investor under the Trust Agreement.

## 2. Plaintiffs Do Not Become Keep Policy Investors by Purchasing Defaulting Victim Investors' Interests

Plaintiffs argue that they are Keep Policy Investors by virtue of having purchased defaulting interests of Victim Investors.  Contrary to Plaintiffs' contention, however, I find no evidence in the record that Plaintiffs succeeded to defaulted investors' status as Keep Policy Investors.  Plaintiffs argue that they purchased "all right, title and interest in and to" the "Acquired Assets"[32] and that the purchased interests were given to Plaintiffs "free and clear of all Encumbrances."  (DE 91 at 10).  Therefore, Plaintiffs contend that they succeeded to defaulting

---

[32] As discussed *supra*, the "Acquired Assets," which the Plaintiff Trusts purchased from the Receiver, are defaulted viaticated interests in life insurance policies.

investors' Keep Policy Investor status.  (DE 91 at 9-10).  Adding to this argument, Plaintiffs assert

that "Acheron owns interests in the same exact Keep Policies as the other investors," and "[t]here

is no reasoned basis to conclude that Acheron is anything other than a Keep Policy Investor by

virtue of the fact that it owned those fractional interests at the time they were poured into the

Trust."  (DE 91 at 10).  As Defendant correctly argues, however, Plaintiffs point to no evidence

that the Receiver or the Trustee conveyed, or even could convey, to Plaintiffs the status of Keep

Policy Investor, or the rights of any victim's status as a Keep Policy Investor under the Trust.

(DE 99 at 8).  Furthermore, being invested in policies with other investors (who may be owed a

fiduciary duty) or being invested in interests at the time the interests were poured into the Trust,

without more, does not convey upon Plaintiffs the status of a Keep Policy Investor.[33]  Therefore,

I find that Plaintiffs' argument regarding succeeding to defaulting investors' status as Keep Policy

Investors lacks merit.

   Accordingly, for the above reasons, I find that Plaintiffs cannot prove that they are owed

a fiduciary duty under the Trust Agreement.  Therefore, Defendant should be granted summary

judgment as to the Count 2 claims for breach of fiduciary duty.

### 3.  Defendant Does Not Owe an Implied Fiduciary Duty to Plaintiffs

   I find that Plaintiffs fail to establish that Defendant owes them an implied fiduciary duty.

"A fiduciary relationship may be implied by law, and such relationships are 'premised upon the

specific factual situation surrounding the transaction and the relationship of the parties.'"  *Doe v.*

---

[33] As discussed *supra*, Plaintiffs' purchases, which were made directly from the Receiver prior to
the Closing Date representing interests that were subsequently "poured into the Trust," do not
confer Keep Policy Investor status upon Plaintiffs because Plaintiffs are also required to fall within
the meaning intended by the language "owned of record by the Receivership Entities."

*Evans*, 814 So. 2d 370, 374 (Fla. 2002).   Under Florida law, a fiduciary relationship is characterized as follows:

> The relation and duties involved need not be legal; they may be moral, social, domestic or personal. *If a relation of trust and confidence exists between the parties (that is to say, where confidence is reposed by one party and a trust accepted by the other, or where confidence has been acquired and abused), that is sufficient as a predicate for relief.* The origin of the confidence is immaterial.

*Doe v. Evans*, 814 So. 2d 370, 374 (Fla. 2002) (emphasis in original) (quoting *Quinn v. Phipps*, 93 Fla. 805, 810 (1927).   "A fiduciary relationship must be established by competent evidence, and the burden of proving such a relationship is on the party asserting it."   *Orlinsky v. Patraka*, 971 So. 2d 796, 800 (Fla. 3d DCA 2007) (finding no general fiduciary duty "in the context of two business associates").   "To establish a fiduciary relationship, a party must allege some degree of dependency on one side and some degree of undertaking on the other side to advise, counsel, and protect the weaker party."   *Watkins v. NCNB Nat. Bank of Fla.*, N.A., 622 So. 2d 1063, 1065 (Fla. 3d DCA 1993).   "The fact that one party places its trust or confidence in the other does not create a confidential relationship in the absence of some recognition, acceptance, or undertaking of the duties of a fiduciary on the part of the other party."   *Scanz Techs., Inc. v. JewMon Enterprises, LLC*, No. 20-22957-CIV, 2021 WL 65466, at *8 (S.D. Fla. Jan. 7, 2021) (internal quotation marks and citation omitted).   Indeed, "[o]ne may not unilaterally impose a fiduciary responsibility on another simply by reposing trust; absent some conscious acceptance of such duties, no fiduciary relationship is created."   *Brenmar Holdings, LLC v. Regions Bank, N.A.*, No. 15-CV-23755, 2016 WL 4270206, at *4 (S.D. Fla. Aug. 15, 2016) (internal quotation marks and citation omitted).

"When the parties are dealing at arm's length, a fiduciary relationship does not exist because there is no duty imposed on either party to protect or benefit the other."   *Taylor Woodrow Homes Fla., Inc. v. 4/46-A Corp.*, 850 So. 2d 536, 541 (Fla. 5th DCA 2003).   "Thus, an ordinary

commercial transaction generally does not give rise to a fiduciary relationship." *Immediate Cap. Grp., Inc. v. Spongetech Delivery Sys., Inc.*, No. 10-60059-CIV, 2010 WL 1644952, at *2 (S.D. Fla. Apr. 22, 2010) (collecting cases). "Fundamental contractual principles continue to bar a tort claim where the offending party has committed no breach of duty independent of a breach of its contractual obligations." *Freeman v. Sharpe Res. Corp.*, No. 6:12-CV-1584-ORL-22T, 2013 WL 2151723, at *8 (M.D. Fla. May 16, 2013) (citing *Tiara Condo. Ass'n. Inc. v. Marsh & McLennan Cos., Inc.*, 110 So. 3d 399, 408-09 (Fla. 2013) (Pariente, J. concurring)).

Plaintiffs allege that, even if they are not Keep Policy Investors as defined by the Trust Agreement, Defendant owes Plaintiffs implied fiduciary duties because Defendant retains control over the Keep Policies and/or because Plaintiffs are successors to defaulting investors to whom Defendant owed fiduciary duties under the Trust Agreement. (DE 46 at 19). For reasons stated above, I do not find that Plaintiffs are successors to the fiduciary status of defaulting investors. I proceed by addressing Plaintiffs' allegation that Defendant's "ongoing 'extensive control' over Keep Policies triggers an implied fiduciary duty in favor of Acheron," which Defendant allegedly breached. (DE 91 at 14; DE 46 at ¶¶103-126).

Plaintiffs fail to establish that Defendant owes them a fiduciary duty implied by law for several reasons. First, while Defendant acknowledges that "Plaintiffs depend on the Trust to continue to maintain and administer the Keep Policies held by the Trust," he correctly argues that the parties are dealing with one another at arms-length. (DE 77 at 19). Even if Defendant did owe Plaintiffs a duty to maintain and administer the policies – and I do not find that he does – Plaintiffs fail to allege that Defendant did not maintain and administer the Keep Policies such that a breach of that duty exists. Because the parties are dealing at arm's length, however, a fiduciary duty does

67

not even exist because "no duty [is] imposed on either party to protect or benefit the other" in such dealings. (DE 77 at 19) (citing *Immediate Cap. Grp., Inc.*, 2010 WL 1644952, at *2).

Indeed, the arms-length nature of the relationship between Plaintiffs and Defendant is evidenced through various contracts between them. It is undisputed, in fact, that Plaintiffs purchased all of their interests *via purchase contracts* post-receivership at a discount.[34] (DE 74-1 at 3:¶6, 9-40; DE 74 at ¶¶5. 15; DE 90 at ¶¶5, 15; DE 76 at ¶18; DE 92 at ¶18). Plaintiffs, however, were not able to take possession of the policy interests that they purchased; rather, the policies in which they purchased interests required a party to serve as nominal owner on behalf of all investors. Therefore, the Court first designated the Receiver as such owner and then "[the] Trustee to serve in the stead of the Receiver." (DE 76 at ¶¶4-5, 7, 14; DE 92 at ¶¶4-5, 7, 14). Plaintiffs, being sophisticated investors and understanding the requirement for a nominal owner with control over the policies, entered into purchase agreements, first with the Receiver and then with Defendant. Therefore, the "control" exercised by Defendant was not indicative of a "degree of dependency on one side and some degree of undertaking on the other side to advise, counsel, and protect the weaker party." *Watkins*, 622 So. 2d at 1065. Rather, the control was anticipated and accepted as part of bargained-for exchanges between Plaintiffs and Defendant. Furthermore, when Plaintiffs disagreed with Defendant about issues pertaining to administration of the policies, including issues pertaining to who would service the policies,[35] Plaintiff Acheron Capital entered

---

[34] Plaintiffs reported at a June 2020 status conference in the Receivership Action that they historically paid five percent (5%) of face value for HIV policies or seven-and-a-half percent (7.5%) of face value for non-HIV policies. (SEC DE 2693 at 82:4-6). In more recent years, Plaintiffs lowered their pricing to two percent (2%) and three-and-a-half percent (3.5%) respectively. (SEC DE 2693 at 82:21-22).

[35] Section 3 of the March 2015 Agreement provides that "the Trustee shall not negotiate a new servicing agreement or further extension . . . without giving Acheron the right to participate

into the March 2015 Agreement with Defendant furthering the contractual relationship and demonstrating Plaintiffs' bargaining power. As such, I find that Plaintiffs' relationship with Defendant is an arms-length contractual relationship, and the Court should reject Plaintiffs' efforts to elevate the contractual or business relationship with Defendant to that of a fiduciary relationship.

Second, Plaintiffs' grounding of their implied fiduciary duty claims in the premise that they must be treated equally to Victim Investors who are Keep Policy Investors under the Trust Agreement because Defendant controls administration of the Trust's assets lacks support in the law. (DE 46 at ¶105). Defendant's control over the administration of the Trust's policies as nominal owner is necessary as discussed above; however, such control does not evince a requirement for Plaintiffs to be treated equally with the Victim Investors. Furthermore, Plaintiffs cite no authority to support that control alone should entitle them – as owners of fractional interests held in a Trust that was created to maintain assets from a former receivership – to equal treatment with victims for whose benefit such Trust was created.

Indeed, the Victim Investors, to whom Defendant owes a fiduciary duty, are very different from Plaintiffs. Victim Investors' relationship with the Trust is not contractual. Victim Investors, by virtue of their claims for losses, were (and are) entitled to recovery from the receivership estate preceding the creation of the Trust whereas Plaintiffs have never had any claims to the receivership estate. Furthermore, the receivership was formed to protect the interests of Victim Investors and not third-party purchasers of defaulting interests such as Plaintiffs. Likewise, the Receiver sought the formation of the Trust to continue protecting the interests of Victim Investors and not for the purpose of protecting third-party purchasers of defaulting interests such as Plaintiffs. (DE 76 at

---

actively in any negotiations that involve servicing of any policies in which Acheron has an interest." (DE 76-33).

¶9; DE 92 at ¶9; SEC DE 2315 at 4-5). The record evidence in the Receivership Action also indicates that through the formation of the Trust the Receiver even sought to protect Victim Investors *from* Plaintiffs to the extent that any real or perceived conflict of interest existed between Plaintiffs and the Trust's servicer. (SEC DE 2315 at 4-5). Therefore, Plaintiffs fail to demonstrate that Defendant has a duty implied by law to treat them equally with Victim Investors based upon Defendant's control or otherwise.

Third, Plaintiffs fail to establish that they reposed trust that Defendant accepted. *Brenmar Holdings, LLC*, 2016 WL 4270206, at *4. As noted *supra*, Plaintiffs contend that Defendant testified that he had not taken a definitive position on whether "Acheron" was a Keep Policy Investor to whom he owed fiduciary duties. (DE 92 at ¶31) (citing DE 74-2, Ex.1, pp. 81:16-25, 82:1-17, 84:9-25, 85:1-12, 86, 89:1-10-21-25, 90:1-25, 91:1-11). As previously discussed, however, I find that Defendant actually testified that he was very definitely of the view that Plaintiffs were not Keep Policy Investors and were not owed a fiduciary duty. (DE 74-2, Ex. 1, pp. 85:6-10; 88:17-89:9). Also, Plaintiffs were aware of Defendant's position at least as of the time that immediately preceded negotiation of the March 2015 Agreement, which agreement imposed *contractual* obligations for equal treatment due to the parties' disparate views. (DE 74-2, Ex. 1, pp. 85:6-10; 88:17-89:9). Additionally, the March 2015 Agreement acknowledges that the parties disagreed about Plaintiffs being Keep Policy Investors to whom Defendant owed a fiduciary duty. (DE 76-33). Furthermore, it is undisputed that Defendant understood that the purpose of the Trust was to maintain and preserve the Keep Policies for the benefit of Victim Investors and that he is fiduciary *to the Victim Investors* who continue to hold interests in Keep Policies. (DE 76 at ¶13; DE 92 at ¶13). Thus, I agree with Defendant that "no trust had been accepted by the Trustee with respect to Plaintiffs, and by virtue of the March 2015 Agreement

itself, Plaintiffs had no reason to believe any such trust had been accepted by the Trustee." (DE 99 at 11). Accordingly, I find that Plaintiffs have failed to carry their burden to show that Defendant accepted any repose of trust in order to create an implied fiduciary duty as a matter of law.

Fourth, Defendant is correct that Plaintiffs' fiduciary duty claims mimic the contract claims, and I find no legal or factual basis for the claims independent of the breach of contract claims. *Freeman*, 2013 WL 2151723, at *8; *Susan Fixel, Inc.*, 842 So. 2d at 209 ("The various tort claims as alleged by [plaintiff] are distinct and independent from the contractual relationships between the parties."). As previously discussed, Plaintiffs base their fiduciary duty claims on Defendant's control of the policies, but the mere allegation of control is insufficient to establish the Administrative Fee Credit Claims, the Delay in Sale Claims and the Reporting Claims as tort claims under a theory of implied fiduciary duty. Furthermore, as Defendant correctly argues, Plaintiffs' response "completely fails to identify either any facts or duties that distinguish the [contract] claims from [the fiduciary duty claims]." (DE 99 at 10). Thus, I find that Plaintiffs fail to "allege conduct that does not itself constitute breach of the contract at issue." *XP Glob., Inc. v. AVM, L.P.*, No. 16-CV-80905, 2016 WL 6679427, at *3 (S.D. Fla. Nov. 14, 2016). Accordingly, for all of the above-stated reasons, I conclude that Defendant is entitled to summary judgment on Count 3 (Breach of Implied Fiduciary Duty).

### E. Whether the Claim for Breach of the Trust Agreement Fails (Count 4)

In granting in part and denying in part the motion to dismiss the Second Amended Complaint, the District Court determined that Plaintiffs' "claim for breach of the Trustee's contractual obligations under the Trust Agreement . . . is predicated on Acheron's status as a Keep Policy Investor." (DE 45 at 18). The District Court further stated that "[i]f Acheron can establish it is a Keep Policy Investor, it has asserted a claim that the Trustee breached its Trust Agreement

duty to provide investors with a written report regarding the financial condition of the Trust and Litai's performance, not less than once per year." (DE 45 at 18). In denying the motion to dismiss, the Court found that "the materiality of the purported breach . . . survives a Rule 12(b)(6) motion[,] and instructed that "Florida law requires 'an award of at least nominal damages if a breach of contract has been established.'" (DE 45 at 19-20) (citing *Walter Inter. Productions, Inc. v. Salinas*, 650 F.3d 1402, 1418 (11th Cir. 2011); *Ducool USA, Inc. v. PAR Family Limited P'ship*, No. 12-21989, 2012 WL 5420014, at *2 (S.D. Fla. Nov. 6, 2012)).

In the Third Amended Complaint, Plaintiffs again premise their claim for breach of the Trust Agreement on "Acheron['s status as] a Keep Policy Investor and a beneficiary under the Trust Agreement." (DE 46 at ¶129). The Third Amended Complaint alleges various financial reporting breaches, including: (i) failure to file any financial report during 2013 and delays with reporting in 2014, 2015, 2016 and 2017 (DE 46 at ¶131); failure to file timely written reports on Litai's performance (DE 46 at ¶132); failure to provide a complete report of the financial condition of the Trust or its operations (DE 46 at ¶133); failure to provide an independent review or audit (DE 46 at ¶134); failure to provide information regarding the Trust's operations and expenses incurred, including expenses paid to the Trustee and Trustee Related Persons such as the Trustee's accounting firm (DE 46 at ¶135); failure to disclose and justify professional expenses (DE 46 at ¶136); and failure to respond to Acheron's requests for explanations of disclosures that raise red flags or allow Acheron to pay its share for an audit (DE 46 at ¶¶137-39) .

Under Florida law, . . . "the elements of a breach of contract action are: (1) a valid contract; (2) a material breach; and (3) damages." *Alhassid v. Bank of Am.*, N.A., No. 14-CIV-20484, 2015 WL 11216721, at *4 (S.D. Fla. Sept. 14, 2015) (internal quotation marks omitted) (citing *J.J. Gumberg Co. v. Janis Servs., Inc.*, 847 So. 2d 1048, 1049 (Fla. 4th DCA 2003); *Rollins, Inc. v.*

*Butland*, 951 So. 2d 860, 876 (Fla. 2d DCA 2006).  Nonetheless, a plaintiff demonstrating a breach

of contract is entitled to nominal damages even if the plaintiff suffered no damages.  *Schreiber v.*

*Ally Fin. Inc.*, 634 F. App'x 263, 265 (11th Cir. 2015) (citing *AMC/Jeep of Vero Beach v. Funston*,

403 So.2d 602, 605 (Fla. 4th DCA1981).

Defendant argues that he is entitled to summary judgment on Count 4 for three (3) reasons.

First, Defendant contends that Plaintiffs are not Keep Policy Investors under the Trust Agreement

and are not, therefore, beneficiaries.  (DE 77 at 20).  Second, Defendant argues the Count 4 claims

are moot because allegations that mirror the instant allegations were brought and decided in the

Receivership Action.  (DE 77 at 20-21).  Third, Defendant argues that Plaintiffs cannot establish

an essential element of a breach of contract claim – how Plaintiffs were injured as a result of

Defendant's purported breach.[36]  (DE 77 at 21).

As a preliminary matter, Plaintiffs do not address Defendant's third argument that Count 4

fails as a matter of law for lack of allegations that Defendant's conduct caused them injury.

(DE 91).  On that basis alone, Defendant is entitled to summary judgment on Count 4.  "[A] failure

to make an argument in response to a motion for summary judgment generally operates as a

waiver."  *Yunker v. AllianceOne Receiveables Mgmt., Inc.*, No. 10CV61796-UU, 2011  WL

---

[36] Defendant also argues that Plaintiffs failed to comply with the Court's order dismissing the Amended Complaint (DE 24) by not clarifying how the different categories of factual allegations support each of Plaintiffs' causes of action and show Plaintiffs are entitled to relief.  (DE 77 at 21). The District Court addressed this issue in the context of a "shotgun pleading" because "the Amended Complaint state[d] factual allegations regarding multiple breaches of different contracts, yet [had] one count for breach of contract that lump[ed] them all together."  (DE 24 at 15) (citing *Weiland v. Palm Beach County Sheriff's Office*, 792 F.3d 1313, 1322-23 (11th Cir. 2015)).  The Third Amended Complaint separated the two counts for breach of contract and alleged facts specific to each.  Therefore, I proceed by addressing Count 4 consistent with the District Court's findings in the Order granting in part and denying in part the motion to dismiss the Second Amended Complaint.  (DE 45).

13323094, at *1 (S.D. Fla. Aug. 2, 2011) (collecting cases).  Nonetheless, I address Defendant's other two arguments in the interest of thoroughness.

First, for reasons discussed above, I agree that Plaintiffs are not Keep Policy Investors. Therefore, Defendant is due summary judgment on Count 4 on that basis.  Second, as to mootness, Defendant is correct that the District Court adopted in part a report and recommendation addressing Plaintiff Acheron Capital Ltd.'s Motion for Order Directing Disclosure of Trustee's Fees and Expenses and Audit of Trust Operations as Required by 736.0813(1)(d) and 736.08135(2)(b), Fla. Stat. (SEC DE 2580)  and denied the motion without prejudice "because whether Acheron qualifies as a Keep Policy Investor remain[ed] unresolved."  (SEC DE 2824 at 2-3).  The District Court also determined, however, that the Trust was governed by The Florida Trust Code and the Trust Reporting Statute.  (SEC DE 2824 at 3).  Therefore, the District Court found that, in fulfilling the requirements for financial reporting as set forth in the Trust Agreement, "the Trustee must still comply with The Florida Trust Code in preparing the Annual Financial Reports."  (SEC DE 2824).  On January 14, 2021, Defendant filed in the Receivership Action his Trustee's (I) Notice of Compliance with Order Regarding Disclosure and Audit; (II) Certification Regarding Trustee Compensation; and (III) Motion to Modify Trust Agreement or Instructions from the Court, which certified that Defendant had conformed the Trust's financial disclosures provided to Keep Policy Investors in accordance with the Court's directives.  (SEC DE 2847). "The Eleventh Circuit has held that a case must be dismissed as moot if events that occur subsequent to the filing of a lawsuit deprive the court of the ability to give the plaintiff meaningful relief."  *Barnhill v. Inch*, No. 4:18-CV-564-MW/MAF, 2020 WL 6049559, at *6 (N.D. Fla. Aug. 28, 2020), *report and recommendation adopted*, No. 4:18CV564-MW/MAF, 2020 WL 6048744 (N.D. Fla. Oct. 13, 2020) (internal quotation marks omitted) (citing *Al Najjar v. Ashcroft,* 273 F.3d

1330, 1336 (11th Cir. 2001)).  Here, the Court has determined the reporting requirements with which Defendant must comply, and Defendant has certified compliance.  Plaintiffs' claims for breach of the Trust Agreement have thus been mooted by subsequent events.  Accordingly, for the reasons detailed above, I find that Defendant is entitled to summary judgment with respect to Count 4.

## II.      PLAINTIFFS' PARTIAL MOTION FOR SUMMARY JUDGMENT[37]

For the reasons detailed below, I find that Plaintiffs fail to demonstrate that the undisputed facts entitle them to summary judgment on the two issues they raise: (i) whether Plaintiffs are KPIs and (ii) whether Plaintiffs are entitled to the AFC even if they are not KPIs.  As such, I find that Plaintiffs' MSJ should be denied.

### A.  Whether Plaintiffs are KPIs

Plaintiffs argue that they are KPIs for three (3) reasons: (i) the Trust Agreement definition is unambiguous, and they meet that definition; (ii) even if the definition is ambiguous, parol evidence supports that the parties intended for Plaintiffs to be KPIs under the Trust Agreement. (DE 75 at 12-18); and (iii) the Receiver and Defendant conveyed KPI status to Plaintiffs as part of the Plaintiffs' purchases of interests in Keep Policies.  As for Plaintiffs' first reason, they argue that they fit within the Trust Agreement's *unambiguous* definition of a KPI.  (DE 75 at 12-13).  In support of their position, Plaintiffs proffer that it is undisputed that "Acheron acquired entire and fractional interests in Keep Policies from the Receiver, the Receiver transferred the same policies and interests to the Trust, the interests were not forfeited as of the Closing Date – the date of the

---

[37] Plaintiffs request a hearing on their motion to submit oral argument because of the extensive history in the Receivership Action, which is related to the instant litigation.  (DE 75 at 20).  I decline to hold a hearing, however, because I am sufficiently versed in the Receivership Action having presided over that case for many months (and the District Court has presided over it since its inception).

sale to Litai in 2009 of the servicing assets – and that all Keep Policies were *at one time* owned of record by the Receivership Entities.  (DE 75 at 13).  Thus, Plaintiffs contend that they are "persons who have invested in an entire interest or a fractional interest in a Keep Policy owned of record by the Receivership Entities, and whose interest in such Keep Policy has not been forfeited as of the Closing Date."  (DE 75 at 12) (citing SEC DE 2538 at 3, n.3, which, in turn, cites the Trust Agreement at Art. 1, § 1.1).

Plaintiffs also argue, in support of their position that the definition is unambiguous,  that their status as a KPI is consistent with the purpose of the Trust.  (DE 75 at 12).   The stated purpose of the Trust is to "take custody of the Trust Assets and maintain and administer the Trust Assets for the benefit of the Keep Policy Investors, consistent with the terms and procedures set forth in th[e] Trust Agreement."  (DE 75 at 12) (quoting Trust Agreement at Art. 2, § 2.2).  Plaintiffs argue that the purpose of the Trust is consistent with their status as KPIs because the creation of the Trust "envisioned that . . . [investors] other than an original investor would qualify as a Keep Policy Investor," and Plaintiffs' status as a KPI is consistent with "the practical aspect of how [the Trust] is maintained."  (DE 96 at 3).

Plaintiffs' arguments lack merit.  First, Plaintiffs' argument that the definition of KPI is unambiguous directly conflicts with the District Court's finding that the definition is ambiguous. (DE 45 at 13) (stating that "the Court determined that the definition of a Keep Policy Investor was ambiguous").   "The initial determination of whether the contract term is ambiguous is a question of law for the court, and, if the facts of the case are not in dispute, the court will also be able to resolve the ambiguity as a matter of law."  *Strama v. Union Fid. Life Ins. Co.*, 793 So. 2d 1129, 1132 (Fla. 1st DCA 2001).  As a matter of law to be determined by the Court, the District Court held that the definition was ambiguous because any interpretation needed to give effect to all of

the language in the definition but yet "the definition exclude[d] a date and all the fractional interests were originally owned by the Receivership entities."  (DE 24 at 12).

Contrary to their argument, Plaintiffs' interpretation of the definition of KPI makes the words "owned of record by the Receivership Entities" superfluous because the words would be unnecessary if their only purpose was to identify that *at one time* the subject policies had to be owned by the Receivership Entities.  (DE 75 at 13-14).  All the policies were owned *at one time* by the Receivership Entities.   "The ordinary rule in contract interpretation is that an interpretation giving reasonable meaning to all provisions of a contract is preferred to one which leaves a part useless or inexplicable."  *Gherardi v. Citigroup Glob. Markets Inc.*, 975 F.3d 1232, 1239 (11th Cir. 2020) (internal quotation marks and citation omitted).  As Defendant correctly argues, as of the date of the Future Administration Order in May 2007 in the Receivership Action, the Receiver was the owner of record of all the policies that had been previously owned of record by a Receivership Entity.  (DE 89 at 6).  By the time that the Trust Agreement was created in September 2009, all of the policies under the Receiver's control had been owned of record at one time by the Receivership Entities.  The Receiver then transferred all policies under his control to the Trust.  Plaintiffs had purchased policy interests from the Receiver, and later from the Trustee, but never from the Receivership Entities.  Thus, the language "owned of record by a Receivership Entity" may reasonably be interpreted to mean those investors who purchased from a Receivership Entity rather than merely identifying the source from where all policies originated when they were transferred to the Trust as Plaintiffs argue.  (DE 75 at 14).  The interpretation urged by Defendant – that the definition of a KPI is one who purchased from the Receivership Entities – gives meaning to all of the language in the definition whereas Plaintiffs' interpretation renders the "owned of

record" language and even the very definition of KPI surplusage.  Therefore, Plaintiffs cannot demonstrate that their interpretation reflects the unambiguous meaning of the KPI definition.

Further, as discussed above with respect to Defendant's MSJ, the purpose of the Trust is consistent with Defendant's interpretation that KPIs are the Victim Investors.  (DE 75 at 7-8). "The settlor's intent is the polestar of trust interpretation." *Horgan*, 249 So. 3d at 686.   As stated previously, it is undisputed that the Receiver, as settlor, sought the formation of the Trust to continue protecting the interests of Victim Investors and not for the purpose of protecting third-party purchasers of defaulting interests such as Plaintiffs.  (DE 76 at ¶9; DE 92 at ¶9).  Therefore, I conclude, as Defendant argues, that "[t]here is no reason to believe that the Receiver, or the Court in approving the Trust Agreement, intended for an arms-length, third-party purchaser of forfeited interests from the Trustee to be on the same footing as the original victims of the Mutual Benefits scheme."  (DE 89 at 8).

Plaintiffs' second reason for believing that they are KPIs is likewise without merit. Plaintiffs argue that, to the extent that the definition of KPI is ambiguous, parol evidence supports that the definition was intended to include them.  (DE 75 at 16-18).  Specifically, Plaintiffs argue that course of performance supports that they are KPIs because (i) Plaintiffs received the AFC for five (5) years under the Servicing Agreement; (ii) the servicer treated them as KPIs; and (iii) the Servicing Agreement's terms specifically provided that KPIs may have successors.

Defendant, on the other hand, argues that the unrebutted evidence indicates that the parties responsible for creating, administering, and servicing the Trust intended the Trust to benefit the Victim Investors and not third-party purchasers such as Plaintiffs.  (DE 89 at 10).  As I previously discussed and as Defendant argues, the Receiver, who is the settlor of the Trust, created the Trust for the benefit of the Victim Investors.  (DE 89 at 10).   On this basis alone, I conclude that

Plaintiffs' MSJ on the KPI issue is due to be denied.  However, for the sake of thoroughness, I turn to Plaintiffs' arguments regarding parol evidence.

Consistent with the discussion above relative to Defendant's MSJ, I do not find that parol or extrinsic evidence supports that Plaintiffs are KPIs.  With respect to payment of the AFC, I agree with Defendant that the parol or extrinsic evidence indicates only that Defendant elected to pay an AFC to Plaintiffs voluntarily under the initial five-year term of the Servicing Agreement. (DE 89 at 12).  Defendant's business decision to pay the AFC does not transform Plaintiffs' arms-length business relationship with Defendant into a fiduciary relationship.

As to the servicer's treatment of Plaintiffs as KPIs, Defendant correctly argues that the servicer's treatment and the servicer's beliefs have no bearing on whether Plaintiffs are KPIs under the Trust Agreement.  (DE 89 at 12).  The fact that the interests are serviced in the same manner does not establish a fiduciary relationship between Plaintiffs and Defendant, and the servicer's beliefs or intentions have no evidentiary value because the servicer is not a party to the Trust Agreement nor to any agreements between the Trust and Plaintiffs.  (DE 89 at 12-13). Also, as discussed *supra*, the Servicing Agreement and the Trust Agreement's definition of Keep Policy Investor were structured the same as "persons who have invested in an entire interest or a fractional interest in a Keep Policy owned of record by the Receivership Entities" and any assertion by Plaintiffs to the contrary is not supported by the record.  (DE 75 at 17; DE 46-1 at Art. 1, § 1.1; DE 74-2 at 64-103:Art. 1 § 1.1; DE 74-3 at 7-24).

Relative to the Servicing Agreement's recognition of "successors" to Keep Policy Investors, Defendant is correct that such recognition undermines Plaintiffs' position because the provisions address changes to policies due to investor deaths, divorces and similar changes in investors' circumstances.  (DE 89 at 13) (citing DE 74-3 at 5:¶19).  Nowhere does the Servicing

Agreement provide for the transfer of a KPI's interest to a third-party purchaser.  As previously discussed, forfeited interests revert back to the Trust, which then offers the interests for sale. Therefore, the Servicing Agreement's provisions addressing "successors" does not support, nor in any way even contemplates, Plaintiffs stepping in as successors to the interests of KPIs.

Plaintiffs third reason for believing that they are KPIs also lacks merit.  Plaintiffs argue that they acquired the KPI status, and beneficiary status, by virtue of their purchases of defaulted interests because the Asset Purchase Agreements entered into with the Receiver and the Trustee represented the conveyance of the Acquired Assets "free and clear of any Encumbrances."  (DE 75 at 15).  Thus, Plaintiffs argue that they "succeeded to the defaulting investor's Keep Policy Investor status."  (DE 75 at 16).

Plaintiffs, however, are incorrect because the Receiver and Defendant did not convey Victim Investor's status as KPIs to Plaintiffs.  (DE 75 at 16).  Plaintiffs submitted an Asset Purchase Agreement and Bill of Sale entered into with the Receiver (DE 74-1 at 10-40).  Section 4.3 states that "[a]ll of *Seller's and each Receivership Entity's* claims, options, privileges, right, title and interest in to, and under the Acquired Assets, including all beneficial interests in the Policies, will be sold, conveyed, assigned, transferred and delivered to Buyer at Closing, free and clear of all Encumbrances." (DE 74-1 at 15:§ 4.3) (emphasis added).  Similarly, an Asset Purchase Agreement and Bill of Sale entered into with Defendant states at § 4.3 that "[a]ll of *Seller's and Trust's claims*, options, privileges, right, title and interest in to, and under the Acquired Assets, including all beneficial interests in the Policies, will be sold, conveyed, assigned, transferred and delivered to Buyer at Closing, free and clear of all Encumbrances."  (DE 46-2 at 8:§ 4.3) (emphasis added).  As Defendant argues, there is no transfer or assignment of the Victim Investor's particularized rights from being defrauded.  (DE 89 at 9).  Indeed, a receiver marshals and

preserves assets of receivership entities and does not represent defrauded investors, who maintain their individualized rights. *See Wiand v. Lee*, 753 F.3d 1194, 1202 (11th Cir. 2014) (citing *Scholes v. Lehmann*, 56 F.3d 750 (7th Cir.1995) for the proposition that a receiver acts on behalf of the corporations put into receivership that were injured by a scheme to defraud); *see also Isaiah v. JPMorgan Chase Bank*, 960 F.3d 1296, 1307–10 (11th Cir. 2020) (instructing that, even when a receiver does not have standing to sue on behalf of receivership entities because a schemer's torts cannot be separated from the receivership entities, a receiver still does not represent the defrauded investors, who must file claims as creditors for a recovery to be determined by the Court).

Thus, the Receiver only acquired and conveyed rights of the Receivership Entities and interests in the Acquired Assets and did not acquire or convey the individual rights of Victim Investors as beneficiaries of the receivership estate.  Because the Receiver transferred no individualized rights of investors to the Trust, including those as beneficiaries, Defendant did not acquire such rights and could not convey such rights to Plaintiffs.  As such, Plaintiffs did not acquire Victim Investors' status as KPIs by virtue of their purchases from either the Receiver or Defendant.

Therefore, for all of the above reasons, I find that Plaintiffs are not KPIs and are not beneficiaries of the Trust.  Accordingly, I recommend that Plaintiffs' MSJ be denied on this issue.

### B.  Whether Plaintiffs are Entitled to the AFC

Plaintiffs argue that they are entitled to the AFC, which was discontinued after the initial five-year term of the Servicing Agreement.  (DE 75 at 18-20).  As grounds, Plaintiffs argue that "the plain, clear and simple language of the March 2015 Agreement . . . entitle[s] [Plaintiffs] to the same credits afforded to [KPIs]."  (DE 75 at 20) (citing *Barakat v. Broward Cty. Hous. Auth.*, 771 So. 2d 1193, 1195 (Fla. 4th DCA 2000) ("It is never the role of a trial court to rewrite a contract

to make it more reasonable for one of the parties or to relieve a party from what turns out to be a bad bargain.").  As discussed *supra*, the March 2015 Agreement states that:

> The Trustee will not grant or otherwise offer to any other investors in Keep Policies, including Keep Policy Investors, any rights, disbursements, rebates, benefits, credits (through an Administrative Fee Credit or otherwise) or any other distribution of the Overpayment Balance or other consideration, that the Trustee does not grant or offer to Acheron with respect to its interests in Keep Policies on the same terms, whether as part of the existing Servicing Agreement, the Renewal Agreement, or through the Trustee's administration of the Trust.

(DE 74 at ¶23; DE 90 at ¶23; DE 76 at ¶45; DE 92 at ¶45).

Defendants correctly argue, however, that Plaintiffs completely ignore the fact that the March 2015 Agreement references and acknowledges the Renewal Agreement, which eliminates the AFC in favor of Plaintiffs.  (DE 89 at 14).  "[W]here multiple agreements are entered into by the same parties, at the same time, concerning the same transaction or subject matter, they are generally construed together as a single contract."  *Ziplocal, LP*, 795 F.3d at 1268.  Furthermore, [w]here a writing expressly refers to and sufficiently describes another document, the other document, or so much of it as is referred to, is to be interpreted as part of the writing."  *Pier 1 Cruise Experts*, 929 F.3d at 1340-41.  Plaintiffs' insistence on looking only at the March 2015 Agreement without trying to harmonize the language in the referenced and simultaneously approved Renewal Agreement is at odds with Florida law.

Several facts support that the agreements should be construed together.  The fact that both agreements took effect simultaneously, following the Court's approval of both agreements, indicates that the agreements should be read together.  The fact that the Renewal Agreement may have triggered the March 2015 Agreement, was negotiated without Plaintiffs' knowledge and is not an agreement to which Plaintiffs are parties does not negate the need to harmonize its language with the March 2015 Agreement.  (DE 96 at 7).  As Defendant argues and as previously discussed,

82

"the March 2015 Agreement *required* approval of the Renewal Agreement without modification." (DE 77 at n.11; DE 89 at 15, 18) (emphasis in original).  Also, Plaintiffs reviewed and approved the motion seeking the Court's simultaneous approval of both agreements, and no Plaintiff objected to the Court's approval of the motion.  (DE 89 at 18).  Thus, I conclude that the agreements should be construed together.

Additionally, "the interpretation the parties give to a contract may be the best indication of their intentions."  *Mayflower Corp.*, 655 So. 2d at 1137.  Therefore, to the extent that the clear conflict with Renewal Agreement creates an ambiguity, Plaintiffs' subsequent conduct in knowingly paying the full AFC for years without complaint and without any rational explanation for doing so supports Defendant's contention that the parties intended Section 2 to apply to *additional* rights and benefits that were not addressed by the Renewal Agreement.  (DE 89 at 18-20).

 For the above reasons, I find that Plaintiffs fail to carry their burden to show that the undisputed facts demonstrate Plaintiffs' entitlement to the AFC.  As such, I conclude that Plaintiffs' MSJ should be denied with respect to the AFC issue.

## **CONCLUSION**

For the reasons discussed above, I respectfully **RECOMMEND** that the District Court:

1.  **DENY** Defendant's MSJ (DE 77) to the extent that Defendant argues that the Plaintiff Trusts lack the capacity to sue;

2.  **GRANT** Defendant's MSJ as to Counts 1 through 4;

3.  **DENY** Plaintiffs' MSJ (DE 75);

4.  **DENY** all pending motions as **MOOT**; and

5.  **ORDER** the Clerk of Court to **CLOSE** this case.

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Federico A. Moreno, United States District Judge.  Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice.  *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

**DONE AND SUBMITTED** in Fort Lauderdale, Florida this 24th day of September 2021.

Jared M. Strauss
United States Magistrate Judge

Copies furnished via CM/ECF to:

Hon. Federico A. Moreno
Senior United States District Judge

Counsel of record